# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-06-00682-CR

**Robert Bartlett, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE COUNTY COURT AT LAW NO. 5 OF TRAVIS COUNTY
### NO. 679168, HONORABLE NANCY WRIGHT HOHENGARTEN, JUDGE PRESIDING

## O P I N I O N

A jury convicted Robert Bartlett of the misdemeanor offense of assault based on evidence that he punched a woman in the mouth, breaking her upper jaw and dislocating teeth, during an altercation at the 2004 Republic of Texas Motorcycle Rally. The trial court assessed punishment at one year's imprisonment and a $2,000 fine, but suspended imposition of the sentence and placed Bartlett on community supervision for two years.

Prior to trial, Bartlett had moved unsuccessfully to suppress two categories of evidence tending to incriminate him: (1) a written statement that he had given following the incident and (2) photographs of his hand revealing what Bartlett admitted was "a tooth mark or something." Bartlett had also moved unsuccessfully to quash the information—which alleged that he had "intentionally, knowingly, and recklessly" hit the victim on or about the head with his hand—on the

ground that it failed to allege, with reasonable certainty, the acts relied upon to constitute recklessness. *See* Tex. Crim. Proc. Code Ann. art. 21.15 (West 1989).

In three issues on appeal, Bartlett asserts that the trial court abused its discretion in failing to grant his motion to suppress evidence, refusing to quash the information, and subsequently submitting an instruction regarding recklessness in the jury charge. We will affirm the judgment.

## BACKGROUND

**The assault**

Based on the evidence presented at trial, the events in question occurred in the early morning hours of June 6, 2004, during the annual Republic of Texas Motorcycle Rally at the Travis County Exposition Center. The rally's events and activities that evening included a Hank Williams, Jr. concert. Heidi Amos, her parents, and a group of family friends were returning from the concert to their campsite on the Expo Center grounds. They were riding in the back of a flatbed trailer, which was being towed by a small four-wheel "recreational-type vehicle." According to Amos, they were proceeding along the only road from the concert area to their campsite, which was crowded with people on motorcycles, in four-wheel vehicles, and on foot. Amos testified that the scene was "very much like a parade for the mere fact that there's so many people, you move very slowly."

A motorcyclist, later identified as Bartlett, was riding in the procession immediately behind Amos's trailer. Amos testified that Bartlett rode his motorcycle forward until his front tire wedged against the back of her trailer, and then began performing "burnouts."[1] The force

---

[1] A "burnout," Amos explained, is a technique in which a motorcyclist throttles his or her engine while the front wheel is held stationary, causing the back wheel to spin uncontrollably, often accompanied by considerable smoke and loud engine noise. According to Sergeant Chuck Jones of

of the accelerating motorcycle, Amos recounted, began pushing her trailer and the attached four-wheeler forward into a crowd of pedestrians. Bartlett was asked to stop. He continued. Soon another motorcyclist joined Bartlett, with the two performing burnouts against the back of Amos's trailer. This caused the four-wheeler to be pushed forward with even more force, causing its driver to begin to lose control.

Amos's group expressed displeasure at Bartlett's behavior. By one account, one of them threw a beer bottle at Bartlett, hitting him and causing him to fall with his bike. Whatever its precise origins, a fight broke out between Bartlett and a man named "Roy" from Amos's group. Amos testified that the fight lasted approximately two minutes. Afterward, Amos's group continued slowly down the road toward their campsite. Amos did not observe Bartlett following them.

Approximately twenty minutes later, as Amos's group was continuing along in the procession in their trailer, they approached an area where Bartlett and his friends were camped. Another altercation broke out, although witnesses again differed as to how it began. Amos testified that as her group approached, members of Bartlett's group moved toward Amos's trailer and one threw a beer bottle at Roy. The bottle missed Roy but hit Amos in the chest. Amos testified that this led to another altercation between Roy and Bartlett. As the two men fought on the ground near the trailer, a "crowd of people" approached, trying to separate the two. Amos testified that when some people tried to pull Bartlett away from Roy, Bartlett started to fight them.

the Travis County Sheriff's Office, whose pivotal role in the underlying events is discussed below, many of the motorcyclists at the rally would ride around a large loop around the Expo Center grounds that was "basically called a parade area," where "the people parade their motorcycles . . . do burnouts, spin their tires . . . show how fast their bike runs, how much noise it makes . . . especially at night because of the exhaust lighting up . . . and they just keep going around this loop."

As the fighting escalated, Amos claims that she stepped off of the trailer and started to yell, "Hey, this is enough." Before she finished that statement, Amos testified, Bartlett hit her in the mouth with his fist. The impact broke Amos's upper jaw and fractured and dislocated her two upper front teeth. She then fell onto broken glass, cutting her knee and ankle. EMS was dispatched to the scene. Because of the large and tightly compacted crowds, EMS used a golf cart to remove Amos from the Expo Center grounds to an ambulance that it parked at the Center's front entrance. It took approximately 35 minutes for EMS to get the golf cart to Amos's location and remove her to the waiting ambulance. Amos ultimately required multiple surgeries to her mouth, plus stitches to her knee.

**The investigation**

Sergeant Chuck Jones of the Travis County Sheriff's Office was the supervisor for the 2-7 a.m. shift of "uniform security" at the motorcycle rally.[2] At the hearing on Bartlett's motion to suppress, Sgt. Jones estimated the motorcycle rally crowd at "25, 28,000, I mean, 30,000 . . . it was packed . . . and we had people left over from the concert, too." Jones's security force consisted of a total of eight officers "actually on duty," counting Jones and two officers "held over from the shift before to help us out because we had so much going on."

Sgt. Jones was aware that "a pretty severe assault" had been dispatched earlier that evening and that EMS, with some difficulty because of the large crowds, had transported the victim to the hospital. One of the deputies on duty had found the location where the assault had occurred

---

[2] Jones explained that he was in uniform but off-duty, having clocked out of his normal shift with Travis County before coming to the Expo Center.

or the victim had been. Jones had directed the deputy to go to the hospital and interview the victim. Jones, accompanied by another sergeant and a deputy, went to that location. Jones testified that these were the only two officers he had available at the time. He used his patrol car to get to the location, observing that "[i]t was really kind of congested for vehicles, so it was hard to get around."

At this location, Sgt. Jones explained, were several members of the group that had been with Amos at the time of the assault and "we had quite a few people trying to tell us what happened and they were saying that they saw the girl get assaulted." One individual identified himself as James Priester. According to Jones, Priester recounted that the assailant had been doing burnouts against the back of their trailer and that "some of the people in his group," including Priester, had "wanted to know what he was doing or got upset with him or started yelling at him, you know, that kind of a disturbance type thing." Then, Jones indicated Priester told him, the assailant "just started hitting people and that's when the female got assaulted."

"Quite a few" of Priester's group, according to Sgt. Jones, also indicated that "they found the suspect that did it."[3] Jones, with the two accompanying officers, walked with "several of" the Priester group toward the area where they indicated the assailant was. Eventually, "several subjects pointed out [the assailant] in a group of people." Although the officers had told the Priester group members to remain "away back from us . . . because we told them not to go any closer because we didn't want to have another disturbance," Jones testified that "they were close enough to point him out," and he had no question as to which individual the group had identified.

---

[3] By this time, Jones estimated that "an hour . . . hour and a half maybe" had elapsed since EMS had transported the victim away.

Sgt. Jones explained that the suspect, whom he later identified as Bartlett, was in the midst of "another large group of people" at a campsite who appeared to be his friends. Jones asked the two officers accompanying him to control Bartlett's group as Jones approached the suspect. Then, according to Sgt. Jones:

> I came up behind him and told him who I—put my hand on his shoulder I think, I believe. I believe I did. I put my hand on his shoulder and my hand on his other hand and told him I was with the Sheriff's Department and he needed to come with me and, you know, I didn't want to have any—any problems. So I put the handcuffs on him.

Jones testified that he handcuffed the assault suspect to assure the officer's safety. At trial, he elaborated:

> [I]t was a security issue more than anything. I didn't want him to get hurt. Didn't want us to get hurt. And I wanted to get him out as quickly as I could without causing any problems . . . . we had two groups of people at that point. We had Mr. Bartlett's group, and then we had the group with the victim that was pointing him out. And I didn't want that—those groups getting together. I didn't want to cause more problems than we already had.

When asked during the suppression hearing why he didn't simply interview Bartlett at his campsite, Jones explained, "We had a lot of people to deal with . . . I didn't know Mr. Bartlett before that day and I didn't know the people in his camp, and we had people yelling at people and other fights going on, and I took him from the camp for our safety to go some place else and talk."

Sgt. Jones recounted that the suspect "wanted to know what was going on" and that Jones "just kind of explained to him that I needed to talk to him." The sergeant acknowledged that Bartlett was "pretty cooperative" and "didn't give me any trouble at all," but observed that Bartlett's

6

friends "were a little agitated that I was taking Mr. Bartlett." Jones noted that "[w]e were actually inside a group of people," so "we backed out of that group of people," and "actually some of them followed me out of the crowd a little bit." Jones assured the crowd, "calm down, I got to talk to him, but I'll bring him back." He explained these actions:

> Because I didn't want another problem. We had three officers, we were grossly outnumbered. Like I said, I didn't know Mr. Bartlett's group or Mr. Priester's group before that so I didn't know what was going to happen. At that point I didn't have Mr. Bartlett identified or anything, so I told them that to keep the other problems from happening.

Sgt. Jones escorted Bartlett back toward his patrol car, which was located, according to Jones's varying estimates, 400-500 or "a few thousand" yards away. As they approached the car, according to Jones, the Priester group "became belligerent," "started getting a little bit aggressive," and "mouthing off" to Bartlett. Jones placed Bartlett in the back seat. (At this point, Priester looked inside the car and positively identified Bartlett as the assailant.) Sgt. Jones observed that some of the people in the Priester group appeared intoxicated, and some had black eyes, cuts, and scratches. They confirmed, in response to Jones's inquiry, that they had been in an altercation, which Jones deduced was the same one in which Bartlett had been involved.

Meanwhile, Sgt. Jones recounted, "Mr. Bartlett's group had come over to Mr. Priester's group and they were exchanging words and we were trying to separate everybody." The situation was deteriorating to the point that Jones "didn't feel it was safe to be there." He decided that "it would be best to get [Bartlett] out of here." Jones testified that, given the circumstances, using a patrol car was both the safest and the "only feasible way" of transporting Bartlett. Jones testified that he told Bartlett that he was not under arrest but that "we were going to

7

go someplace where we could talk, because there was [sic] more problems coming to us as we were getting back to the car."

Sgt. Jones drove his patrol car, with Bartlett in the back seat, approximately two thousand yards away from the two rival groups to a location that he described as follows:

> It's a show barn. It's an open area, open walls where they had—where they keep all the vendors for these motorcycle rallies, and the area that we had was—it was just a little temporary looking little four foot fence that went from the vendor area to where the registration and, you know, they kept all the drinks and stuff like that. The—the area we were at was a table right inside there. . . .

Jones testified that he uncuffed Bartlett when they walked into the barn and sat at the table. Jones added that other people were walking through the open area and could see Jones sitting at the table with Bartlett. Jones further observed that there was nothing "hanging on the wall or anything" indicating that the area was "the place of business" for the Travis County Sheriff's Office.

Jones reiterated to Bartlett that "he wasn't under arrest, that he was . . . just up there to talk to me and I wanted to hear his side of the story."[4] Jones also explained to Bartlett that he had earlier used the handcuffs "for our safety." Bartlett began to explain to Jones his version of events. To summarize, Bartlett claimed that Amos and Priester's group were the first aggressors, knocking him to the ground and hitting him. Only then, Bartlett claimed, did he hit back.

As they were talking, Jones asked Bartlett if he "would like to make a statement." According to Jones, Bartlett replied, "sure." Jones again told Bartlett, "I tell people I'm not going to arrest them, I keep my promise. You know, . . . you're not going to go to jail no matter what you

---

[4] Jones added that, in fact, he "didn't have the manpower or the inclination to take [Bartlett] to jail that night, so I had already made up my mind that I wasn't going to make an arrest."

tell me." Then, leaving Bartlett unattended and uncuffed at the table, Jones walked to his patrol car, retrieved a "voluntary statement" form, and returned to the table. At this point, Jones recited to Bartlett the *Miranda*[5] warnings printed on the top of the form. Jones testified that Bartlett understood the warnings and demonstrated to Jones's satisfaction that he could read. Jones transcribed Bartlett's oral account and handed it to Bartlett to review. Bartlett signed and initialed the statement. Its contents were the following:

> The first time I was on my bike and I bumped a trailer. I put my wheel against the trailer and did burn outs. Some guy jumped off the trailer and knocked me down, hit me in the face and kicked me. Everybody broke the fight up and the trailer left. About half [an] hour later the trailer came back around. The people started yelling at me. We were all fighting and everyone was hitting me. There were four or five people hitting me and I was hitting at the people back. I hit everyone that pulled me around and if I hit a girl I don't remember. I got cuts on my right hand that look like a tooth mark or something.
>
> I'm sorry if I hurt someone.

Jones informed Bartlett that the statement would be "turned in to our detectives" and that they could later "get a warrant for your arrest." While they were at the barn, Jones took some photographs of Bartlett, displaying the "cuts on my right hand" that Bartlett had described in his statement.

After taking Bartlett's statement, Jones put Bartlett back in the patrol car, this time without handcuffs, and returned Bartlett to his group. Jones told the group that he had "kept his promise" about returning Bartlett to them, and asked them to stay away from Priester's group.

---

[5] *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

**Proceedings below**

Bartlett was subsequently charged by information with "intentionally, knowingly, and recklessly" assaulting Amos. Prior to trial, Bartlett moved to suppress his written statement and the photographs as fruits of a warrantless arrest without probable cause or lawful authority.[6] The parties similarly joined issue as to whether Bartlett was "in custody" within the meaning of article 38.22, code of criminal procedure, at the time he gave his written statement. *See* Tex. Code Crim. Proc. Ann. art. 38.22 (West 2005) (placing conditions on evidentiary use of written statements "made by an accused as a result of custodial interrogation"); *Miranda v. Arizona*, 384 U.S. 436, 444 (1966); *Dowthitt v. State*, 931 S.W.2d 244, 254-55 (Tex. Crim. App. 1996). The trial court denied the motion, stating that "I do find the State met its burden of showing some evidence of some circumstances that gave rise to the need to transport Mr. Bartlett away from the scene" and that Bartlett "was not in custody" when giving his statement.

Bartlett also moved to quash the information on the basis that the State failed to allege, with reasonable certainty, the acts relied upon to constitute recklessness. *See* Tex. Code Crim. Proc. Ann. art. 21.15 (West 1989). The trial court denied the motion to quash, but expressly allowed Bartlett "to reurge the motion at trial." Bartlett did raise the argument at trial, objecting on the same grounds to the trial court's inclusion of a recklessness instruction in the jury charge. The trial court overruled the objection.

---

[6] During the hearing, Bartlett's trial counsel specifically relied on "Article I, Section 9 of the Texas Constitution, the Fourth Amendment and the Fourteenth Amendment of the United States Constitution, Article 38.23 and Chapter 14 of the Code of Criminal Procedure."

After hearing the evidence at trial, the jury found Bartlett guilty of the offense of assault with bodily injury. Bartlett elected to have the trial court assess punishment, and punishment was assessed at one year's imprisonment and a $2,000 fine. The court suspended imposition of the sentence and placed Bartlett on two years' community supervision. This appeal followed.

## DISCUSSION

**Motion to suppress**

In his first issue, Bartlett contends that the trial court abused its discretion in denying his pretrial motion to suppress his written statement and photographs. We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review. *Ford v. State*, 158 S.W.3d 488, 493 (Tex. Crim. App. 2005). The trial judge is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given to their testimony. *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). We give trial courts almost complete deference in determining historical facts, but we review de novo the trial court's application of the law. *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000). Where, as here, the trial court did not make explicit written findings of fact, we view the evidence in the light most favorable to the trial court's rulings and assume that the trial court made implicit findings of fact that are supported by the record. *Ford*, 158 S.W.3d at 493. We "uphold the trial court's ruling if it is reasonably supported by the record and is correct under any theory of law applicable to the case." *State v. Steelman*, 93 S.W.3d 102, 107 (Tex. Crim. App. 2002).

11

Bartlett urges that his "statement and the photographs of him are the products of an unlawful arrest and an improper custodial interrogation." In support, he devotes much of his briefing to establishing that Sgt. Jones had "seized" him under the meaning of the Fourth Amendment and article I, section 9 of the Texas Constitution. *See California v. Hodari D.*, 499 U.S. 621, 628 (1991) (Fourth Amendment "seizure" occurs when reasonable person would not believe that he was free to leave and either (1) officer applied physical force with lawful authority, or (2) suspect submitted to assertion of authority); *Johnson v. State*, 912 S.W.2d 227, 232-35 (Tex. Crim. App. 1995) (holding that the *Hodari D* standard also defines "seizures" under article I, section 9). Bartlett describes his seizure interchangeably as "custody" and a warrantless arrest. He asserts that "he was seized and restrained of his liberty (i.e., under arrest) from the moment that Jones placed him in handcuffs, identified himself as being with the Sheriff's Department, placing his hands upon Appellant, and telling him 'he needed to come with me.'" Bartlett argues that Sgt. Jones lacked probable cause or legal authority to arrest him or take him into custody without a warrant. *See United States v. Watson*, 423 U.S. 411, 417 (1976); Tex. Code Crim. Proc. Ann. art. 14.03(a)(1), (2) (West Supp. 2007).

The State concedes that Sgt. Jones "seized" Bartlett, but argues that the seizure did not constitute "custody" or a warrantless arrest, but was instead an investigative detention.[7] Under both the Fourth Amendment and article I, section 9 of the Texas Constitution, a law enforcement officer may stop and briefly detain a person without probable cause whom he reasonably suspects of criminal activity. *Balentine v. State*, 71 S.W.3d 763, 771 (Tex. Crim. App. 2002) (citing *Terry*

---

[7] The State concedes that at the time he initiated the seizure, Sgt. Jones lacked probable cause or lawful authority to arrest Bartlett.

12

*v. Ohio*, 392 U.S. 1, 21-22 (1968)); *Rhodes v. State*, 945 S.W.2d 115, 117 (Tex. Crim. App. 1997).

Although both constitute seizures, investigative detentions are not arrests, and are not subject to the requirements of a warrant or probable cause. *See State v. Moore*, 25 S.W.3d 383, 386 (Tex. App.—Austin 2000, no pet.).[8] Nor do investigative detentions constitute "custody" in the sense of article 38.22 and *Miranda*. "A person is in custody if, under the totality of the circumstances, a reasonable person would believe his freedom of movement was restrained to the degree associated with a formal arrest." *Stansbury v. California*, 511 U.S. 318, 322 (1994); *Dowthitt v. State*, 931 S.W.2d 244, 254-55 (Tex. Crim. App. 1996); *Houston v. State*, 185 S.W.3d 917, 920 (Tex. App.—Austin 2006, pet. ref'd). Thus, a valid investigative detention, which is characterized by lesser restraint than an arrest, does not constitute custody. *See Berkemer v. McCarty*, 468 U.S. 420, 438-39 (1984) (traffic stops and *Terry* stops are considered seizures but not custody because of their "nonthreatening," "noncoercive," and "brief" character compared to formal arrests); *Dowthitt*, 931 S.W.2d at 255 ("*Stansbury* indicates that the restriction upon

---

[8] By post-submission letter, Bartlett emphasizes a recent decision from the Dallas Court of Appeals, *State v. Purdy*, No. 05-07-00133-CR, 2008 Tex. App. LEXIS 102 (Tex. App.—Dallas Jan. 9, 2008, no pet. h.), which he cites for the proposition that "an 'arrest' under Article 14.03, C. Cr. P., is not limited to a formal, custodial arrest, and may include detention pursuant to a reasonable suspicion." To the extent Bartlett views *Purdy* as blurring the distinctions between investigative detentions and arrests in any manner relevant to this case, we reject that contention. *Purdy* and the line of decisions on which it relies stand for the narrow concept that the limitations within subsections (d) and (g) of article 14.03 on warrantless "arrests" by law enforcement officers outside their territorial jurisdictions similarly restrict such officers' investigative detentions. *See Purdy*, 2008 Tex. App. LEXIS 102, at *5-*6 (discussing *Brother v. State*, 166 S.W.3d 255, 256-60 (Tex. Crim. App. 2005), *cert. denied*, 546 U.S. 1150 (2006)); *see also State v. Kurtz*, 152 S.W.3d 72, 79-80 (Tex. Crim. App. 2005); *and Mitchell v. State*, 187 S.W.3d 113, 116 (Tex. App.—Waco 2006, pet. ref'd).

freedom of movement must amount to the degree associated with an arrest as opposed to an investigative detention.").

In his briefing, Bartlett did not squarely address the State's contention that Sgt. Jones's seizure of him constituted an investigative detention, arguing essentially that he was seized and that status, without more, equals an arrest and custody. During oral argument, Bartlett disputed whether the State met its burden of justifying an investigative detention as of the time Jones initially restrained him. An investigative detention is justified when the detaining officer has specific articulable facts, which, taken together with rational inferences from those facts, lead him reasonably to suspect that the person detained actually is, or has been, or soon will be involved in criminal activity. *Balentine*, 71 S.W.3d at 769. The record supports the trial court's implied findings of such facts here. Jones testified that a "pretty severe assault" at the motorcycle rally had, in fact, been reported earlier in the evening and that EMS had transported an injured victim to the hospital. Jones proceeded to the location that a deputy had previously determined to be the site of the assault. While there, several persons claiming to be eyewitnesses to the assault approached the officers, described what had happened, and volunteered that they could identify the assailant and knew where he was. One of these individuals, James Priester, identified himself to Jones. Several members of this group, including Priester, then led Sgt. Jones to Bartlett's location, where they pointed out Bartlett as the assailant. These specific facts gave Sgt. Jones a basis to reasonably suspect that Bartlett had been involved in the reported assault and warranted his temporary detention for further investigation. *See State v. Fudge*, 42 S.W.3d 226, 228-32 (Tex. App.—Austin 2001, no pet.) (cab driver's unsolicited, in-person report to law enforcement that he had seen another motorist driving as if drunk and identification of the vehicle when it approached was sufficient to warrant an investigatory stop).

14

Bartlett further suggests that the extent or degree of his restraint—especially the fact he was handcuffed and placed in the patrol car—would have caused a reasonable person to believe his freedom of movement was restrained to the degree associated with a formal arrest. However, an officer conducting an investigative detention may use such force as is reasonably necessary under the circumstances to effect the goal of the stop: investigation, maintenance of the status quo, or officer safety. *Rhodes*, 945 S.W.2d at 117. Whether such use of force elevates the detention to custody or an arrest turns on the reasonableness of the intrusion under all of the facts. *Moore*, 25 S.W.3d at 386. Factors that may be considered in this inquiry include the degree of force employed, the nature of the crime under investigation, the degree of suspicion, the location of the detention, the time of day, the reaction of the suspect, and whether the officer actually conducts an investigation. *Id.* "[C]ommon sense and ordinary human experience must govern over rigid criteria." *Rhodes*, 945 S.W.2d at 118. "Furthermore, allowances must be made for the fact that officers must often make quick decisions under tense, uncertain and rapidly changing circumstances." *Id.* Consequently, there may be circumstances in an investigative detention that reasonably justify an officer handcuffing a suspect, *Balentine*, 71 S.W.3d at 771 ("There is no bright-line test providing that mere handcuffing is the equivalent of an arrest."); *Rhodes*, 945 S.W.2d at 117-18, placing a suspect in a police car, *Balentine*, 71 S.W.3d at 771, or transporting the suspect to another location for questioning. *Josey v. State*, 981 S.W.2d 831, 841 (Tex. App.—Houston [14th Dist.] 1998, pet. ref'd) ("Safety and security reasons may justify moving a suspect from one location to another during an investigatory stop.").

Also bearing on the custody inquiry is the principle that the "reasonable person" standard presupposes an innocent person. *Florida v. Bostick*, 501 U.S. 429, 438 (1991); *Dowthitt*,

15

931 S.W.2d at 254; *Ramirez v. State*, 105 S.W.3d 730, 738 (Tex. App.—Austin 2003, no pet.). Moreover, the determination of custody depends on the objective circumstances of the interrogation, not the subjective views of the person being questioned or the subjective intent of the officer to arrest or not arrest. *Stansbury*, 511 U.S. at 323; *Dowthitt*, 931 S.W.2d at 254; *Houston*, 185 S.W.3d at 920. But the subjective intent of the officer may be relevant as a circumstance of the interrogation if it is conveyed to the individual being questioned, but only to the extent that the communication of those views would affect a reasonable person's understanding of his freedom of action. *See Stansbury*, 511 U.S. at 325; *Dowthitt*, 931 S.W.2d at 254; *Houston*, 185 S.W.3d at 920.

Sgt. Jones testified that he handcuffed Bartlett—whom had just been identified by several people as the perpetrator of a "pretty severe assault"—to ensure both Bartlett's safety and his own. Rather than questioning Bartlett at his campsite, Sgt. Jones sought to "get him out as quickly as I could" in order to head off a potentially volatile situation between Bartlett's "large group of people" and the similarly "large" Priester group. Jones observed that the three officers "were grossly outnumbered" by the two groups. Jones saw fit to "back[] out of that group of people," whom he characterized as "agitated," and some even started to follow the uniformed officers. "Because [he] didn't want another problem," Jones assured Bartlett's group, "calm down, I got to talk to him, but I'll bring him back." Jones recounted that the situation degraded as they proceeded to the patrol car, where they were confronted by the "belligerent" Priester group, some of whom were intoxicated and showed signs they had been in a fight. Worse, according to Sgt. Jones, Bartlett's group came over "to Mr. Priester's group and they were exchanging words and we were trying to separate everybody." Jones "didn't feel it was safe to be there," and used his patrol car to remove

16

Bartlett from the treacherous environment. Given the circumstances, Jones believed that the patrol car was the safest and "only feasible way" to remove Bartlett.

On this record, the trial court could have impliedly found that Sgt. Jones's decision to transport Bartlett away from the scene in his patrol car was reasonably necessary to maintain the status quo and effect the safety of both the officers and Bartlett himself. *See Josey*, 981 S.W.2d at 841 (Tex. App.—Houston [14th Dist.] 1998, pet. ref'd); *Perez v. State*, 818 S.W.2d 512, 516 (Tex. App.—Houston [1st Dist.] 1991, no pet.). The same can be said regarding Jones's decision to handcuff Bartlett. *See United States v. Sanders*, 994 F.2d 200, 205-08 (5th Cir. 1993) (summarizing cases in which handcuffing suspect was deemed necessary "to allow the officer to pursue his investigation without fear of violence.").

Adding further support to these implied findings are the events once Sgt. Jones and Bartlett reached the "show barn" a safe distance from the volatile environment from which they came. Jones removed the handcuffs from Bartlett and did not apply them again. Jones also explained to Bartlett that he had used the handcuffs "for our safety." Further, Sgt. Jones actually conducted an investigation, asking Bartlett to tell his side of the story. *See Rhodes*, 945 S.W.2d at 119, 119-20 (Meyers, J., concurring) (suggesting that "whether a detention is an arrest or an investigatory stop turns, in large part, upon whether an investigation has occurred).

Sgt. Jones also repeatedly voiced his intent not to arrest Bartlett, but only to question or "talk to him." An officer's subjective views may be relevant to the custody determination to the extent they are communicated and would affect a reasonable person's understanding of his freedom of action. *See Stansbury*, 511 U.S. at 325. Jones testified that he "didn't have the manpower or the inclination to take [Bartlett] to jail that night, so I had already made up my mind that I wasn't going

17

to make an arrest." When Jones detained Bartlett, he told Bartlett's friends, "I got to talk to him, but I'll bring him back." This evidence supports the trial court's implied finding that Bartlett heard these statements. Also, at the patrol car, Jones recounted that he told Bartlett he was not under arrest and that "we were going to go someplace where we could talk, because there was [sic] more problems coming to us as we were getting back to the car." Further, when at the show barn, Jones reiterated to Bartlett that "he wasn't under arrest, that he was . . . just up there to talk to [Jones] and [Jones] wanted to hear his side of the story."

Finally, the setting to which Bartlett was transported is relevant to the custody determination. The record reflects that the "show barn" was an "open area" with "open walls" "where they keep all the vendors." Sgt. Jones explained that other people were walking through this area and could see him sitting at the table with Bartlett. Jones also testified that there was nothing in the area indicating that it was "the place of business" for the Travis County Sheriff's Office. In addition, Sgt. Jones, after having informed Bartlett that he was not under arrest, left Bartlett alone and uncuffed while he went to his patrol car to retrieve the "voluntary statement" form.

In summary, the record supports the conclusion that Sgt. Jones's seizure of Bartlett was an investigative detention, not an arrest or custody. The district court did not abuse its discretion in overruling Bartlett's motion to suppress. We overrule Bartlett's first issue.

**Motion to quash**

In his second issue, Bartlett asserts that the trial court abused its discretion in overruling his motion to quash the information. Whether a charging instrument provides sufficient

18

notice to the accused is a question of law that we review de novo. *See State v. Moff*, 154 S.W.3d 599, 601 (Tex. Crim. App. 2004).

The information alleged, in relevant part:

> Robert Bartlett, the Defendant, on or about June 6, 2004, did then and there intentionally, knowingly, and recklessly cause bodily injury to Heidi Amos by hitting Heidi Amos on or about the head with the Defendant's hand.

Bartlett complains that the information fails to provide notice of the act or acts the State relies upon to constitute the culpable mental state of recklessness. In particular, he relies on article 21.15 of the code of criminal procedure, which states:

> Whenever recklessness or criminal negligence enters into or is a part or element of any offense, or it is charged that the accused acted recklessly or with criminal negligence in the commission of an offense, the complaint, information, or indictment in order to be sufficient in any such case must allege, with reasonable certainty, the act or acts relied upon to constitute recklessness or criminal negligence, and in no event shall it be sufficient to allege merely that the accused, in committing the offense, acted recklessly or with criminal negligence.

Tex. Code Crim. Proc. Ann. art. 21.15.

The State responds that article 21.15 is inapplicable. It relies on *Crawford v. State*, 646 S.W.2d 936 (Tex. Crim. App. 1983), which involved an indictment alleging—like the information here—that the defendant had acted "intentionally, knowingly, and recklessly." *Id.* at 937. Crawford had moved to quash the indictment, urging that it "failed to allege with reasonable certainty the act or acts relied on to constitute recklessness." *Id*. The trial court overruled the motion, and Crawford was ultimately convicted. Crawford appealed, bringing a single point of error

19

challenging the trial court's ruling on his motion to quash. The court of criminal appeals affirmed, reasoning that:

> All three of the culpable mental states, intentionally, knowingly, and recklessly, were alleged. Since it is sufficient to allege either of the culpable mental states, the indictment on its face alleges two culpable mental states, intentionally and knowingly, which are not subject to the complaint concerning the culpable mental state, recklessly, made in the appellant's motion to quash. The indictment is sufficient and we need not determine the requirements of the indictment, if recklessly had been the only alleged culpable mental state.

*Id*. at 937. As the State views the case, *Crawford* holds that article 21.15 governs only when recklessness is the sole culpable mental state alleged—not where, as here, recklessness is alleged along with intentional or knowing conduct. This Court has previously expressed the same view, albeit in dicta.[9]

Bartlett attempts to distinguish *Crawford* as addressing not the sufficiency of notice, but the concept of "fundamental defect" in charging instruments then recognized by the court of criminal appeals. Under this concept, if a charging instrument failed to allege all elements of the offense, any subsequent judgment of conviction was deemed void and could be attacked at any time on direct appeal or through a post-conviction habeas petition. *See Ex parte Patterson*, 969 S.W.2d 16, 18 (Tex. Crim. App. 1998) (surveying this history). By contrast, certain other defects in charging

---

[9] *See State v. McCoy*, 64 S.W.3d 90, 94 n.2 (Tex. App.—Austin 2001, no pet.) (holding that charging instrument alleging only reckless conduct failed to comply with article 21.15, but distinguishing those alleging intentional, knowing, and reckless conduct on basis that under *Crawford*, an "indictment alleging that defendant acted intentionally, knowingly, and recklessly need not comply with article 21.15 requirements."); *see also Griffin v. State*, No. 03-02-00016-CR, 2003 Tex. App. LEXIS 1711, at *3 (Tex. App.—Austin Feb. 27, 2003, no pet.) (mem. op., not designated for publication) ("[B]ecause the indictment alleged that Griffin acted intentionally and knowingly, as well as recklessly, compliance with article 21.15 was not required." (citing *Crawford*)).

instruments were considered merely of "form" and were required to be raised in a timely manner or be waived. *See Gengnagel v. State*, 748 S.W.2d 227, 228-29 (Tex. Crim. App. 1988). Regarding article 21.15's requirements in particular, the court of criminal appeals distinguished between the failure of a charging instrument "to allege with *reasonable certainty* the acts relied upon to constitute recklessness," which it deemed a complaint of "form" that "g[a]ve[] the accused grounds to complain before trial of inadequate 'notice,'" and a failure to allege "the acts themselves," which constituted a fundamental defect. *Id.*; *see Graham v. State*, 657 S.W.2d 99, 104 (Tex. Crim. App. 1983). Contrary to Bartlett's view, *Crawford* addresses the former type of challenge.

The defendant in *Crawford* had moved to quash the indictment, according to the court of criminal appeals, on the basis that the instrument "failed to allege with *reasonable certainty* the act or acts relied on to constitute recklessness." 646 S.W.2d at 937 (emphasis added). This was the sole issue on appeal. *Id.* The court of criminal appeals termed such a complaint one of "form" that "gives the accused grounds to complain before trial of inadequate 'notice.'" *Gengnagel*, 748 S.W.2d at 228-29. The defendant employed the appropriate procedural mechanism—a motion to quash—for challenges based on inadequate notice. *See id.* at 228. Although the *Crawford* court did not elaborate extensively on its reasoning, its references to the "sufficiency" of the indictment are consistent with the court's nomenclature in cases involving notice-based challenges. *See Graham*, 657 S.W.2d at 104; *cf. Gengnagel*, 748 S.W.2d at 230 (referring to a "fundamentally defective" charging instrument). We see no basis for distinguishing what would appear to be the squarely controlling precedent of the court of criminal appeals in *Crawford*.

21

The charging instrument here, like that in *Crawford*, alleges not only recklessness, but intentional and knowing conduct. The *Crawford* court relied on this feature of the instrument in holding that it "need not determine the requirements of the indictment, if recklessly had been the only alleged culpable mental state." 646 S.W.2d at 937. The same rationale is fatal to Bartlett's complaint regarding article 21.15. We accordingly overrule Bartlett' second issue.

Relying on the same underlying theory, Bartlett asserts in his third issue that the trial court abused its discretion in instructing the jury regarding the culpable mental state of recklessness. Bartlett acknowledges that this issue would be foreclosed by our adverse disposition of his second issue. Consequently, we overrule Bartlett's third issue.

## CONCLUSION

Having overruled Bartlett's issues on appeal, we affirm the judgment of the trial court.

_____

Bob Pemberton, Justice

Before Chief Justice Law, Justices Pemberton and Waldrop

Affirmed

Filed: February 21, 2008

Publish

22