**Clinton MITCHELL, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 01–08–00785–CR.

Court of Appeals of Texas,
Houston (1st Dist.).

Feb. 18, 2010.

Discretionary Review Refused
Aug. 25, 2010.

J. Sidney Crowley, Houston, TX, for Appellant.

Alan Curry, Chief Prosecutor, Appellate Division, Harris County District Attorney's Office, Scott A. Durfee, Assistant District Attorney, Houston, TX, for Appellee.

Panel consists of Chief Justice RADACK and Justices ALCALA and HIGLEY.

**OPINION**

LAURA CARTER HIGLEY, Justice.

A jury found appellant, Clinton Mitchell, guilty of criminally negligent homicide.[1] The jury also found, in a special issue, that appellant used a deadly weapon, namely, a motor vehicle, during the commission of the offense. The trial court assessed punishment at five years in prison.[2] In two points of error, appellant challenges the legal and factual sufficiency of the evidence to support his conviction.

We affirm.

**Background**

It is undisputed that, while driving a dump truck for his employer, the City of Houston, appellant ran over and killed the complainant, Adam Knetsar. As a result of the incident, a grand jury indicted appellant for the offense of criminally negligent homicide. The indictment alleged that appellant had caused Knetsar's death by criminal negligence.

At trial, the State presented eight witnesses, who were at the scene of the incident. Chief among them was Chandra Kelly, appellant's co-worker, who was in the passenger seat of the dump truck at the time of the incident.

Kelly and appellant were laborers employed by the City of Houston. On the morning of October 24, 2006, she and appellant had left one job site and were en route to another in a city dump truck. To reach the job site, appellant and Kelly traveled south down Atascocita Road toward Will Clayton Parkway. Where it intersects Will Clayton Parkway, Atascocita Road has four lanes: two middle lanes for traffic going straight, a left turn lane, and a right-turn lane. The route to the next job site required appellant to drive straight through the intersection.

Kelly testified that, as they were approaching the intersection, the dump truck was in the "middle lane." But as they drew closer, the dump truck veered into the "right lane." On questioning, Kelly stated that she was positive that, as they approached the intersection, the light was red; she noted that "[a]ll the cars [were] at a standstill." Kelly testified that she knew they were about to have an accident because she saw a stationery Jeep Cherokee in the right-turn-only lane and noticed that appellant was accelerating. To avert the impact with the Jeep, Kelly testified

---

**1.** *See* Tex. Penal Code Ann. §§ 6.03(d), 19.05 (Vernon 2003).

**2.** The legislature has classified criminally negligent homicide as a state jail felony, unless the State proves that a deadly weapon was used. *See* Tex. Penal Code Ann. § 12.35(c)(1) (Vernon Supp.2009), § 19.05 (Vernon 2003).

In such case, the offense is elevated to a third-degree felony. *See id.* § 12.35(c)(1). Here, the jury made, and the judgment reflects, a deadly-weapon finding. Thus, appellant's five-year sentence is properly within the punishment range for a third-degree felony. *See id.* § 12.34 (Vernon Supp.2009).

that she called appellant's name three times, to no avail. Kelly closed her eyes immediately before the dump truck struck the back of the Jeep. She kept her eyes closed until the truck came to a stop across the street. She testified that she never heard or felt appellant apply the brakes.

Other scene witnesses described how, after the impact with the dump truck, the Jeep went "airborne," with all four of its wheels leaving the pavement. The Jeep struck a traffic light pole and then landed on its driver's side.

After striking the Jeep, the dump truck continued across the intersection toward a group of workers who were installing new traffic signals. Adam Knetsar was among the workers. The dump truck ran over Knetsar, killing him. The truck also struck another worker, who sustained multiple fractures, including two broken legs. After striking the workers, the dump truck continued to roll through a ditch onto a grassy area. It came to a stop at the edge of a Walgreen's parking lot.

With respect to the details preceding the chain of events that resulted in Knetsar's death, the State offered other scene-witness testimony, which corroborated Kelly's account. A number of witnesses commented on the speed of appellant's dump truck as he approached the intersection. One witness noticed in her side mirror that appellant was approaching from behind "very fast." Another driver, who was stopped at the light on Atascocita, saw appellant to his right driving past "at a considerable rate of speed." He believed appellant that was traveling 35 to 45 miles per hour. Yet another witness, who was in a van stopped at the intersection, looked in her rear view mirror and saw appellant approaching from behind in the right-turn-only lane. She observed that he was traveling at "a high rate of speed." The witness recalled that she knew that "something terrible was going to happen" because she had seen a vehicle stopped in the right lane. She knew that appellant was going too fast to either stop for the red light or to make the turn.

In addition, one other witness testified that the Jeep was stopped in the right-turn-only lane before the impact. Two other witnesses, who were at a gas station at the intersection, each unequivocally testified that the light for traffic on Atascocita for southbound traffic was red. Other witnesses, who were in vehicles at the intersection, confirmed that the southbound traffic on Atascocita was stopped at the time of the impact. None of the witnesses, when questioned, heard appellant apply his brakes at any point during the incident.

Only one witness, who was driving behind appellant, testified that appellant's light was green. That witness also testified that appellant was not in the right-turn-only lane when he hit the Jeep. She could not tell where the Jeep was before appellant hit it. The witness also stated that the dump truck was traveling less than 45 miles per hour.

The State also presented the expert testimony of two officers from the Harris County Sheriff's Department. Each officer has specialized training in accident investigation. The first to testify, Sergeant S. Parker, arrived at the scene 45 minutes following the incident.

Sergeant Parker told the jury that he had observed that the right-turn-only lane on Atascocita had a very large gouge mark, indicating the spot of the collision. Sergeant Parker stated that the gouge mark had not weathered and appeared to be freshly made. The sergeant also testified that he found no evidence of braking, such as skid marks, at the scene. Sergeant Parker also observed that the tire

marks on the grassy area, over which the dump truck had traveled before coming to a stop, indicated that the truck's tires had been rolling, not skidding. Sergeant Parker further explained that the truck had rolled through a ditch before stopping and stated that it was natural forces, not braking, that had made the truck finally stop.

Sergeant Parker further testified that the greatest amount of damage to the Jeep was at its rear, indicating that it was hit with the greatest force from behind. On further questioning, Parker explained that damage to the front, left side of the Jeep was caused when the Jeep struck the traffic light pole after being hit from behind.

The State also presented the testimony of Deputy D. Pearson, who testified that he has received advanced accident investigation training. Through the training, Deputy Pearson has learned how to apply different formulas to determine the speed at which a vehicle was traveling at the time of a collision. In this case, Deputy Pearson explained to the jury that he had applied two different formulas to determine the speed of appellant's vehicle at the time of the impact with the Jeep.

Deputy Pearson told the jury that the Jeep had traveled 73 feet before it hit the traffic light pole. Applying the "conservation momentum formula," Deputy Pearson testified that he calculated that the dump truck was traveling at a minimum speed of 37 miles per hour when it struck the back of the Jeep. But, Deputy Pearson also told the jury that he did not think that this was "realistic" and did not reflect the "true speed" of the dump truck. He believed that the truck had been traveling faster.

Deputy Pearson also applied the "energy formula." Using this, he calculated that the dump truck had been traveling at a minimum of 45 to 50 miles per hour at the time of the collision.

The evidence introduced through Deputy Pearson also showed that, at the time the dump truck ran over Knetsar, it was traveling at 23 miles per hour.

In addition, Deputy Pearson told the jury that appellant held a commercial driver's license, which is required to drive a commercial dump truck. The deputy explained that, to obtain a commercial driver's license, a driver must undergo an "extensive" application process and take a specialized driving test. The driver must demonstrate a proficiency in driving the type of commercial vehicle that he will ultimately drive on the road. A holder of a commercial driver's license must also attend a federally mandated safety education program.

The officer explained that these additional requirements are placed on commercial drivers because of the "increased risks" that accompany driving a commercial vehicle. One such risk is the additional weight of commercial vehicles compared to passenger vehicles. As an example, Deputy Pearson noted that the 31,000 pound dump truck in this case weighed eight times that of the Jeep it hit. Deputy Pearson stated, "[W]e know when we have that much mass involved in a crash, there is a potential for serious injury or death that increases."

Deputy Pearson also explained that a dump truck's bumper is much higher than that of a passenger vehicle. As a result, in a collision, the commercial vehicle's bumper will often penetrate the "softer portion" of the passenger vehicle, thereby increasing the severity of the resulting injuries. Deputy Pearson pointed out that such was the case here, as could be seen in the photographs of the Jeep.

Evidence introduced at trial showed that the dump truck had "air brakes." Deputy Pearson explained that air brakes have a half-second delay to engage. He contin-

ued, "[Y]ou have to take [sic] more attention to your driving because it's going to take longer for you to stop."

Following the presentation of the State's case, appellant testified in his own defense. Appellant stated that, as he approached the intersection of Atascocita and Will Clayton, he was driving in the right, center lane to go straight through the intersection. He claimed that Kelly was napping in the passenger seat. Appellant denied that he ever moved into the right-turn-only lane. He stated that he was going 35 to 37 miles per hour.

When asked what color his light was at the intersection, appellant was adamant that his light was green. He stated that two cars in front of him had driven through the intersection. Appellant also testified that the traffic on Will Clayton was stopped, and he could see that the Will Clayton traffic had a red light.

Appellant described how, as he proceeded through the intersection, he saw a "covered truck coming towards my front end" on Will Clayton. On direct examination, appellant testified that he hit his brakes and tried to miss the vehicle. According to appellant, the vehicle "caught [his] front end" and "skidded off me." He stated that he then caught the vehicles back end. He testified that the collision with the back end of the vehicle was the "second impact," not the first. After hitting the vehicle, he said that he "kept going" and that his dump truck went "airborne." After he went airborne, appellant stated that he "landed over" Knetsar.

Appellant testified that he continued to apply his brakes, but explained that the dump truck had air brakes, which are hard to engage. He claimed that, despite his efforts, the air brakes would not "catch."

On cross-examination, appellant provided more details about the collision. He testified that he saw the Jeep coming from his left and that he veered to his right to miss the Jeep. He stated that the Jeep then "caught" the dump truck's left tire and bounced off of it. Appellant said that the Jeep then rotated in front of him, and he struck the Jeep from behind. When the State asked him if his version of the accident had changed since he had given his grand jury testimony, appellant denied that it had changed.

Following appellant's testimony, the State offered two rebuttal witnesses. One of the witnesses was the assistance district attorney, who had taken appellant's grand jury testimony. According to the ADA, appellant had testified during the grand jury proceedings that there had only been one impact between the dump truck and the Jeep. Appellant had not testified, as he did at trial, that there had been a two-stage collision.

Lastly, the State recalled Deputy Pearson. The officer testified that the damage to the Jeep was not consistent with appellant's version of the incident. Deputy Pearson further testified, "It would be physically impossible for that Jeep to overtake the truck and rotate around in front of it and then have a subsequent collision at the rear."

The jury found appellant guilty as charged in the indictment. This appeal followed. Presenting two points of error, appellant challenges the legal and factual sufficiency of the evidence supporting the judgment of conviction.

### Legal Sufficiency

Appellant raises his legal-sufficiency challenge in his first point of error.

### A. Standard of Review

When reviewing the legal sufficiency of the evidence to support a conviction,

we determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Laster v. State,* 275 S.W.3d 512, 518 (Tex.Crim.App.2009) (citing *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)). This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789; *Clayton v. State,* 235 S.W.3d 772, 778 (Tex.Crim.App. 2007).

 Under the law, the trier of fact is the sole judge of the weight and credibility of the evidence. *See* Tex.Code Crim. Proc. Ann. art. 38.04 (Vernon 1979); *Brown v. State,* 270 S.W.3d 564, 568 (Tex.Crim.App. 2008). Thus, when performing a legal-sufficiency review, we may not reevaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *Dewberry v. State,* 4 S.W.3d 735, 740 (Tex.Crim.App.1999). Rather, we "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Hooper v. State,* 214 S.W.3d 9, 16–17 (Tex.Crim.App.2007). We must presume that the factfinder resolved any conflicting inferences in favor of the prosecution and defer to that resolution. *See Jackson,* 443 U.S. at 326, 99 S.Ct. at 2793; *Clayton,* 235 S.W.3d at 778.

**B. Law Governing the Offense**

 A person commits criminally negligent homicide if he causes the death of another by criminal negligence. Tex. Penal Code Ann. § 19.05(a) (Vernon 2003). Criminal negligence occurs when the person ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur. *Id.* § 6.03(d) (Vernon 2003). The offense of criminally negligent homicide "involves inattentive risk creation, that is, the actor ought to be aware of the risk surrounding his conduct or the results thereof [but fails] to perceive the risk." *Stadt v. State,* 182 S.W.3d 360, 364 (Tex.Crim.App.2006) (quoting *Lewis v. State,* 529 S.W.2d 550, 553 (Tex.Crim.App. 1975)).

 The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances, as viewed from the actor's standpoint. *Id.* In short, the State is required to prove that an accused's failure to perceive a substantial risk of death from his conduct grossly deviated from an ordinary standard of care. *See Tello v. State,* 180 S.W.3d 150, 156 (Tex.Crim.App.2005) (citing *Graham v. State,* 657 S.W.2d 99, 101 (Tex.Crim.App.1983) (explaining that criminal negligence is "failure to perceive" risk of death from actor's conduct which must rise to level of "gross deviation" from an ordinary standard of care)).

 In addition, Code of Criminal Procedure article 21.15 requires the State to plead, with reasonable certainty, the acts or circumstances on which the State will rely to prove that the forbidden conduct was committed with the culpable mental state of criminal negligence.[3] *See* Tex.

---

**3.** Article 21.15 provides,
Whenever recklessness or criminal negligence enters into or is a part or element of any offense, or it is charged that the accused acted recklessly or with criminal negligence in the commission of an offense, the complaint, information, or indictment in order to be sufficient in any such case must allege, with reasonable certainty, the act or acts relied upon to constitute recklessness

CODE CRIM. PROC. ANN. art. 21.15 (Vernon Supp.2009); *see State v. Sonnier,* 773 S.W.2d 60, 62 (Tex.App.-Houston [1st Dist.] 1989, no pet.). Article 21.15 serves to place the defendant on notice that he is charged with criminal negligence and to specify the act or acts from which the State will ask the factfinder to infer the required mental state. *See Stadt v. State,* 120 S.W.3d 428, 442–43 (Tex.App.-Houston [14th Dist.] 2003), *aff'd,* 182 S.W.3d 360 (Tex.Crim.App.2005).

## C. Analysis

Here, the indictment identified the following acts by appellant as constituting criminal negligence: (1) failing to maintain a proper lookout for traffic conditions, (2) operating his motor vehicle at an unsafe speed, (3) driving through a "right-turn only lane," (4) driving through a red light, and (5) taking improper evasive action. These same five acts were disjunctively identified in the charge for the jury to consider when determining whether appellant acted with criminal negligence.[4]

To support his legal-sufficiency argument, appellant contends as follows, "The facts as proved did not demonstrate beyond a reasonable doubt that the actions of Appellant which caused the collision in which the complainant was killed constituted criminal negligence. The proof showed, at most, civil negligence."

The Court of Criminal Appeals considered a similar challenge in *Tello v. State,* 180 S.W.3d at 150. There, the appellant, Tello, was towing dirt in a homemade trailer when the trailer unhitched from his truck, and struck and killed a pedestrian.

*Id.* The evidence at trial showed that Tello had not secured the trailer to the truck with safety chains, as required by state law, and that safety chains would have prevented the accident. *Id.* at 151. The evidence also showed that the trailer hitch did not latch properly and had been hammered and bent to make it latch. *Id.* at 152. The State's expert testified that the hitch was defective and that the defect was "obvious." *Id.* Yet other evidence indicated that Tello had improperly loaded the dirt in the trailer, which contributed to it coming unhitched. *Id.* at 153–54.

During closing argument, Tello argued that the trailer had "never popped off before." *Id.* at 154. Tello conceded that he was negligent, but claimed that his negligence did not rise to the level of criminal negligence. *Id.*

In its legal-sufficiency analysis, the Court of Criminal Appeals explained that "[t]he State was not required to prove that appellant 'had a problem with the trailer becoming unhooked' or that the trailer had 'popped off before.'" *Id.* at 157. Rather, "the State was required to prove that [Tello's] failure to perceive a substantial risk of death from his conduct grossly deviated from an ordinary standard of care." *Id.* at 156. The court concluded, "[T]he evidence that the trailer hitch had been hammered a number of times in an attempt to get it to latch properly and [the expert's] testimony that the hitch's defects were 'obvious' support such a finding." *Id.* The court continued, "A jury could also rationally find that appellant should have, but failed, to perceive a substantial and unjustifiable risk of death from his conduct of

---

or criminal negligence, and in no event shall it be sufficient to allege merely that the accused, in committing the offense, acted recklessly or with criminal negligence. TEX.CODE CRIM. PROC ANN. art. 21.15 (Vernon Supp.2009).

4. The charge did not require the jury to make a specific finding regarding one or more of the acts. The jury returned a general verdict, finding appellant "guilty of criminally negligent homicide, as charged in the indictment."

knowingly using a faulty trailer hitch without safety chains on a public road." *Id.* In a unanimous decision, the court held that the evidence was legally sufficient to support Tello's conviction for criminally negligent homicide. *See id.*

Judge Cochran wrote a concurring opinion "to emphasize the fine, but marked, legal line between civil negligence and criminal negligence." *Id.* at 158 (J., Cochran, concurring). She explained that criminal negligence requires "a significantly greater degree of deviation" from the standard of ordinary care than does civil negligence. *Id.* Such deviation must be "gross" or "extreme" and is measured solely by the degree of negligence. *Id.*

Judge Cochran further explained, "Conduct that constitutes criminal negligence involves a greater risk of harm to others" than does civil negligence. *Id.* "A person may be found criminally negligent when he inadvertently creates a substantial and unjustifiable risk of which he ought to be (but is not) aware." *Id.* A jury must determine whether a defendant's failure to perceive a substantial and unjustifiable risk was, under all the circumstances, so grievous that the defendant should be held criminally liable. *See id.*

■ Importantly, despite the requirement that the risk be substantial and unjustified, "criminal negligence does not require proof of the accused's subjective awareness of the risk of harm." *Id.* Instead, "[i]t is a defendant's awareness of the attendant circumstances, not his subjective awareness of the risk of harm, that matters in criminal negligence." *Id.*

Judge Cochran observed that criminal liability was imposed on Tello "because he should have been aware of the substantial risk of death that his failure to both note and repair [the] numerous deficiencies [to the trailer hitch] entailed." She concluded,

Had there been only a single deviation from the ordinary standard of care, e.g., had appellant exercised ordinary care but for the failure to attach a safety chain between the trailer and the truck, then his conduct in "failing to properly secure a trailer to his truck" might constitute mere simple civil negligence, not criminal negligence.

*Id.*

Here, appellant relies on the case of *People v. Boutin,* 75 N.Y.2d 692, 556 N.Y.S.2d 1, 555 N.E.2d 253 (1990) to support his legal-sufficiency challenge. Although a New York case, *Boutin* is pertinent to our analysis because the Court of Criminal Appeals relied on it in *Tello* to overrule Tello's legal-sufficiency challenge and to affirm his conviction. *Tello,* 180 S.W.3d at 157.

In *Boutin,* the New York Court of Appeals reversed a conviction for criminally negligent homicide when the defendant—driving near, and possibly under, the speed limit—struck a marked police car stopped in the right-hand travel lane of an interstate on a rainy, foggy night. *Boutin,* 75 N.Y.2d at 698, 556 N.Y.S.2d 1, 555 N.E.2d at 256. As set out by the *Tello* court, the *Boutin* court provided the following description of New York's criminal negligence standard:

Our decisions construing these provisions have emphasized that criminal liability cannot be predicated on every act of carelessness resulting in death, that the carelessness required for criminal negligence is appreciably more serious than that for ordinary civil negligence, and that the carelessness must be such that its seriousness would be apparent to anyone who shares the community's general sense of right and wrong [citations omitted]. What, we believe, is abundantly clear from our decisions and

from the governing statutory language is that criminally negligent homicide requires not only a failure to perceive a risk of death, but also some serious blameworthiness in the conduct that caused it. The risk involved must have been "substantial and unjustifiable," and the failure to perceive that risk must have been a "gross deviation" from reasonable care.

*Tello,* 180 S.W.3d at 157–58 (quoting *Boutin,* 556 N.Y.S.2d 1, 555 N.E.2d at 254).

Applying this standard, the *Boutin* court reasoned as follows in overturning the defendant's conviction:

[T]here is no question that defendant's failure to see the vehicle stopped in the lane ahead of him resulted in the fatal accident. That failure may well constitute civil negligence. But the proof does not establish *criminal* negligence.... [T]he evidence does not show that defendant was engaged in any criminally culpable risk-creating conduct—e.g., dangerous speeding, racing, failure to obey traffic signals, or any other misconduct that created or contributed to a "substantial and unjustifiable" risk of death. Rather, it establishes only that defendant inexplicably failed to see the vehicle until he was so close that he could not prevent the collision. Though it resulted in two tragic deaths, that unexplained failure, without more, does not constitute criminally negligent homicide.

75 N.Y.2d at 697–98, 556 N.Y.S.2d 1, 555 N.E.2d at 255–56.

■ Here, appellant contends that his case is "on all fours with *Boutin*." Appellant argues in his brief,

[A]ccepting the state's version of the facts, it was simply an unexplained failure to see the stopped Jeep until he collided with it. Although it was alleged that Appellant ran a red light[,] none of the witnesses stated that Appellant

drove through the red traffic signal before the collision. There was nothing per se negligent about driving in a right turn lane. Failing to maintain [a] proper lookout and failing to take evasive action, the other theories alleged in the indictment, are simply the equivalent of the situation in *Boutin,* i.e., failure to see a stopped vehicle before colliding with it.

Contrary to appellant's argument, this case does not involve an unexplained failure to see a stopped vehicle, as in *Boutin.* Unlike *Boutin,* no evidence was presented that appellant did not see the Jeep before he hit it. Appellant's own testimony does not support such contention. Appellant never testified that he did not see the Jeep. In fact, he testified that he saw the Jeep. He disavowed fault by claiming that the Jeep's driver ran a red light.

We also disagree that a failure to take evasive action or to maintain a proper lookout is necessarily the equivalent of failing to see a vehicle before colliding with it, as a claimed by appellant.

In *Boutin,* the defendant driver and his passenger each expressly testified that he did not see the parked police cruiser before the collision, despite its flashing lights. 75 N.Y.2d at 694, 556 N.Y.S.2d 1, 555 N.E.2d at 254. At the time of the collision, it was dark, rainy, and foggy. *Id.* The police car was parked behind a disabled tractor trailer in a lane of the interstate. *Id.* Here, the evidence showed that the accident occurred on a clear day at 10:30 a.m.

Deputy Pearson testified that he could clearly see the intersection from 1,902 feet away. Chandra Kelly testified that she saw the Jeep sitting in the turn-only lane. Other witnesses testified similarly. The evidence further showed that other southbound traffic was stopped at the light.

Kelly also testified that she called out appellant's name three times to warn him of the impending collision, to no avail. Thus, the evidence is such that the jury could have reasonable inferred that an ordinarily prudent driver, keeping a proper lookout, would have seen the Jeep stopped in the right-turn-only lane.

Evidence was also presented from which the jury could have inferred that appellant did not take evasive action by applying his brakes either before hitting the Jeep or before running over Knetsar. Each witness, when asked, stated that he or she had not heard appellant apply his air brakes. The forensic evidence, admitted through the police officer's testimony, also indicated that appellant had never applied his brakes during the entire incident.

In addition, unlike in *Boutin,* the evidence at trial showed that appellant engaged in additional "criminally culpable risk-creating conduct." *See Boutin,* 75 N.Y.2d at 697–98, 556 N.Y.S.2d 1, 555 N.E.2d at 255–56. When viewed in favor of the verdict, the evidence indicated that appellant's light was red as he hit the Jeep and continued through the intersection striking and killing Knetsar. The evidence also showed that appellant was driving the 31,000 pound dump truck at a minimum speed of 37 miles per hour in a right-turn-only lane against a red light. By doing so, appellant collided with the Jeep and initiated the chain of events that resulted in Knetsar's death. The evidence further showed that appellant, with his specialized training, should have been aware of the increased risk of this conduct given the size of his vehicle and its decreased stopping abilities. Under the circumstances, the confluence of appellant's acts and omissions takes his conduct beyond the realm of simple civil negligence. *See Tello,* 180 S.W.3d at 158 (J., Cochran, concurring).

Given the quantum of evidence discussed above, we conclude that the jury could have rationally found that appellant should have perceived, but failed to perceive, a substantial and unjustifiable risk of death from his conduct, as alleged in the indictment. *See Lopez v. State,* 630 S.W.2d 936, 941 (Tex.Crim.App.1982) (determining that driver "ought to have been aware that a substantial and unjustifiable risk was created when he exceeded the speed limit and ran a red light on a city thoroughfare at 11:30 p.m."). The jury also could have rationally found that appellant's failure to perceive this substantial and unjustifiable risk of death was clearly a gross deviation from the standard of care that an ordinary person would exercise under the circumstances. *See Graham,* 657 S.W.2d at 101 (concluding that defendant driver's failure to perceive risk of death from his conduct of speeding, racing, and ignoring red light was clearly gross deviation from ordinary standard of care).

In sum, we conclude that, based on the evidence when viewed through the applicable prism of light, the jury could have found, beyond a reasonable doubt, that appellant possessed the culpable mental state of criminal negligence when he caused Knetsar's death. *See Laster,* 275 S.W.3d at 518. We hold that the evidence is legally sufficient to support the judgment of conviction. *See Lopez,* 630 S.W.2d at 941 (holding that evidence was legally sufficient to support criminally negligent homicide conviction when defendant exceeded speed limit and ran red light); *Todd v. State,* 911 S.W.2d 807, 815 (Tex. App.-El Paso 1995, no pet.) (holding that evidence was legally sufficient to support criminally negligent homicide conviction when defendant had "traveled closely behind another car in excess of the speed limit and during rush hour traffic, failed to watch the traffic in front of him, and failed to apply his brakes before striking a

stalled vehicle"); *Brown v. State*, 773 S.W.2d 65, 67 (Tex.App.-Fort Worth 1989, pet. ref'd) (holding that evidence was legally sufficient to support criminally negligent homicide conviction when defendant was driving at high rate of speed, failed to slow down as he approached intersection, and failed to watch traffic light); *Thompson v. State*, 676 S.W.2d 173, 178 (Tex. App.-Houston [14th Dist.] 1984, no pet.) (holding that evidence was legally sufficient to support criminally negligent homicide conviction when defendant drove her car at excessive rate of speed in residential neighborhood near bus stop when children normally would be on their way to school).

We overrule appellant's first point of error.

### Factual Sufficiency

In his second point of error, appellant contends that the evidence is factually insufficient to support his conviction.

### A. Standard of Review

▆▆▆ When reviewing the factual sufficiency of the evidence to support a conviction, we view all the evidence in a neutral light, favoring neither party, nor the explicating verdict. *See Neal v. State*, 256 S.W.3d 264, 275 (Tex.Crim.App.2008); *Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim.App.2006). We then ask whether the evidence supporting the conviction, although legally sufficient, is nevertheless so weak that the factfinder's determination is clearly wrong and manifestly unjust or whether conflicting evidence so greatly outweighs the evidence supporting the conviction that the factfinder's determination is manifestly unjust. *Lancon v. State*, 253 S.W.3d 699, 704–05 (Tex.Crim.App. 2008); *Watson*, 204 S.W.3d at 414–15, 417.

### B. Analysis

▆▆▆ Here, appellant limits his factual-sufficiency challenge to his assertion that the State's evidence was "so weak as to render the verdict manifestly unjust." We are mindful that, in conducting a factual-sufficiency review, we must consider the most important evidence that the appellant claims undermines the jury's verdict. *See Sims v. State*, 99 S.W.3d 600, 603 (Tex. Crim.App.2003). Appellant begins by pointing out that the scene witnesses were "divided" with regard to whether appellant's light was red and that some witnesses did not know the color of the light. He also points out that one scene witness testified, as appellant did, that appellant's light was green.

A review of all the evidence reveals that, in addition to the testimony cited by appellant, three witnesses, including his passenger, Chandra Kelly, testified unequivocally that appellant's light was red. Other witnesses testified that the southbound traffic on Atascocita was stopped at the intersection from which the jury could have reasonably inferred that the light was red.

The testimony cited by appellant does not supply a basis in the record to show that the evidence is so weak as to render the verdict manifestly unjust. Instead, such evidence is the type that must be evaluated and weighed by the factfinder. *See Lancon*, 253 S.W.3d at 707. A jury's decision is not manifestly unjust merely because it resolved conflicting views of the evidence in favor of the State instead of appellant. *See Cain v. State*, 958 S.W.2d 404, 410 (Tex.Crim.App.1997). Here, the jury was in the best position to weigh and evaluate the evidence with regard to the color of the traffic signal, and we properly afford due deference to that determination. *See id.*

▆▆▆ Appellant also asserts that "there was no evidence that [he] ACTUALLY ran

a red light." Although no witness testified specifically that appellant "ran a red light," at least one witness testified that appellant's light was red at the moment he collided with the Jeep. Two other witnesses testified that the light was red immediately before the collision. Yet other testimony was given that the southbound traffic was stopped at the time. From such evidence, the jury could have reasonably inferred that appellant "ran a red light," when, after hitting the Jeep, he then proceeded through the intersection and ran over Knetsar.

Appellant further points out that it is undisputed that the speed limit on Atascocita was 45 miles per hour. Appellant asserts that only Sergeant Pearson offered testimony that appellant exceeded the speed limit. Other testimony estimated that appellant was driving under, or at, the speed limit. Appellant points out that some witnesses did not testify regarding his speed.

A review of the record shows that the State did not base its allegation that appellant acted with criminal negligence on the theory that appellant exceeded the posted speed limit. Rather, in the indictment, it was alleged that appellant was "operating his motor vehicle at an unsafe speed." Given that the evidence showed that appellant was driving a 31,000 pound dump truck between 35 and 50 miles per hour in a right-turn-only lane against a red light, with a stationery Jeep sitting in his path, the jury could have reasonably found that appellant was "operating his motor vehicle at an unsafe speed." This is true regardless of whether the jury believed appellant's testimony that he was traveling 35 to 37 miles per hour or believed Sergeant Pearson's estimate of 50 miles per hour.

Lastly, appellant asserts, "As noted in the discussion under point of error number one, failure to keep a proper lookout and failure to take evasive action constituted civil, not criminal negligence if the *Tello–Boutin* example is a guideline." Appellant does not elaborate why this argument is more compelling as a factual-sufficiency challenge than it is as a legal-sufficiency challenge. In any event, we disagree that such conduct cannot result in a finding of criminal negligence, as discussed in our legal-sufficiency analysis. We further note that evidence of other conduct, such as running the red light and operating at an unsafe speed, also supported the jury's criminal-negligence determination.

After reviewing all of the evidence in a neutral light, we cannot conclude that the evidence supporting the conviction is so weak that the verdict seems clearly wrong and manifestly unjust, as appellant contends. We hold that the evidence is factually sufficient to support the judgment of conviction.

We overrule appellant's second point of error.

### Conclusion

We affirm the judgment of the trial court.