Opinion issued October 14, 2025



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-24-00429-CR

———————————

**JESSE JAMES CLAY, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 182nd District Court**
**Harris County, Texas**
**Trial Court Case No. 1671000**

---

## MEMORANDUM OPINION

While driving a garbage truck, appellant Jesse Clay reversed over and killed Joe Warren. Clay was indicted for murder. A jury convicted him of the lesser-included offense of manslaughter, and the trial court sentenced Clay to six years' confinement.

In his sole issue on appeal, Clay argues the evidence is insufficient to support his conviction for manslaughter. Under the standard of review, on this record, we disagree and affirm.

## BACKGROUND

### A.    The Incident

Clay was a garbage truck driver for Texas Pride Disposal, a waste management company in Harris County. On the day at issue, Clay was finishing a route in Warren's residential neighborhood when Clay reversed the truck over and killed Warren. The offense was captured on several home surveillance cameras from different angles.

The videos begin with Warren standing at the corner of the intersection of White Oak Glen Court and White Oak Point Court with a large tree branch in his hands. It was daylight, with some light rain visible. The videos then show the garbage truck driving past Warren and proceeding south on White Oak Point Court.

As the videos depict, Warren yelled at the truck as it drove past him, then threw the tree branch at the truck, hitting the side of the truck. Warren then retrieved the branch from the roadway, while yelling and gesturing profanities at the truck.

Next, the videos show the garbage truck stopping and reversing towards Warren, with flashing lights and loud beeping. Warren, still standing on the road, approached the truck as it reversed, carrying the tree branch.

2

The garbage truck continued to reverse toward Warren hitting him and causing him to fall backward. The garbage truck then rolled over Warren, crushing him with the passenger side wheels. The truck stopped on Warren's remains. The videos then show the truck accelerating forward down the roadway, leaving Warren in the street.

As a result of the incident, Clay was indicted for murder.[1]

## B. The Trial

At trial, it was undisputed that Clay was driving the truck that caused Warren's death. No evidence suggested that Clay was under the influence of drugs or alcohol. In addition to the videos of the incident, the jury received the following evidence:

### 1. Initial drive-by.

Clay testified at trial. He admitted he saw Warren on the street when he first passed by. Clay said: "I saw [Warren] as I was passing standing on the sidewalk with a banana leaf in his hand." Clay denied seeing him throw the branch or hearing him yell. Clay also stated that he was unfamiliar with the neighborhood. As to why he drove the truck in reverse toward Warren, Clay said, "I didn't want a complaint. So, that's when I decided to back up and see what he wanted."

---

[1]     TEX. PENAL CODE § 19.02(b).

## 2. Rearview cameras and side mirrors.

Evidence introduced at trial showed that Clay's truck was equipped with a rearview camera that displayed on a monitor in the cabin. James Ballowe (Clay's former manager at Texas Pride Disposal) testified that, "the back camera was the tool to use for helping drivers back [up]," or reverse. Additionally, Kevin Atkinson (Texas Pride's founder and CEO) testified that the truck's rearview camera was a "hopper cam" that remained constantly on and could not be disabled. Atkinson also noted that, when the truck was in reverse, the rearview camera displayed a colored grid (red, yellow, and green) to provide the driver with perspective on the distance between the truck and any objects behind it.

Evidence introduced at trial further showed that Clay's truck had several rearview mirrors on both the driver and passenger sides, which Atkinson explained was to help with visibility.

## 3. Clay's reversal of the truck.

Whether Warren was visible to Clay as he drove the truck in reverse was in dispute. The State presented multiple witnesses who testified that Warren would have been visible to Clay as he reversed. For instance, Atkinson testified that, based on his experience, Warren would have been visible in the rearview camera as Clay reversed and that his remains likely would have also been visible as Clay drove

forward. Atkinson also testified that Warren would have been visible in the truck's side mirrors at times as well.

The State's homicide investigator, Sergeant A. Manzano, similarly told the jury that, while he was in the cabin of the truck investigating (and experimenting), he could see his police partner on the rearview camera as the truck reversed, even though it was dark. Sergeant Manzano further testified that Warren "would have been visible" to Clay as he reversed—both on the truck's rearview camera, at all times, and also, at certain times, on the passenger side mirror.

The State also presented the expert testimony of Owen Bledsoe, an investigator and former crash reconstructionist with the Houston Police Department. Bledsoe testified that the truck's rearview camera had a "very wide field of view" and could capture "at least 60 to 75 feet at minimum" behind the truck. Bledsoe opined that Warren would have been visible on the rearview camera when the truck initially stopped and began reversing. Bledsoe opined that the rain would not have affected Clay's ability to see, but he conceded that the rearview camera could have been foggy or had rain on it at the time. Bledsoe also opined that Warren would have been visible on Clay's passenger mirrors at certain times as he drove in reverse.

In contrast, Clay testified that he did not see Warren on the camera or mirrors while reversing. Clay testified that he "never [saw] [Warren] again since the first time I passed him on the sidewalk."

5

Clay further testified that his view was obstructed due to the weather. He told the jury "[i]t was raining off and on," which "messes up the windshield and the hopper cam" and the mirrors. Clay testified that, while reversing, he "used [both] the side mirrors" and the camera, but he said that it was "hard" to see on the camera "because of the mist and stuff" caused when he "closed the hopper."

The defense also called Joshua Enochs, another driver at Texas Pride Disposal, who similarly testified that when reversing the type of truck Clay was driving, "you cannot see behind you" and that "[y]ou have to depend on your mirrors" mostly and sometimes the camera, but you "can't see anything . . . through the cameras" when it's raining.

### 4. Texas Pride Disposal's policies and procedures.

The jury heard evidence that Clay did not follow the company's policy in reversing the truck. CEO Atkinson testified that the policy was for the driver to use his "helpers" (workers who load trash) to guide the driver while backing the truck.[2] Atkinson testified that Clay had two helpers in the cabin with him at the time of the incident, but that Clay did not utilize his helpers—which Clay did not dispute. Atkinson explained that as "the captain of the ship," the driver is in charge of his

---

[2] Atkinson stated that, per their manual's backing operations procedures, "[t]he helper must be out of the truck and visible to the driver before the driver attempts to back the truck." He confirmed that the helper is supposed to be able to see the driver in the mirrors while the truck is backing.

helpers, and it is the driver's responsibility to tell the helpers to get off and assist. Atkinson testified that the driver should always use his "resources to help guide the truck."

Atkinson also testified that Clay was an experienced driver with a commercial driver's license and had completed the company's required driving and classroom training, where he was taught the company's driver's manual, truck operations, and the policies and procedures for reversing or backing a truck.

Clay, in turn, admitted that he was aware of the policies and procedures for reversing, that his helpers needed to be outside the truck when reversing, and that he was in charge of the helpers as "captain of the ship." Clay agreed that garbage trucks can be very dangerous if operated improperly, and he admitted that it is dangerous to back up the truck with his helpers inside. Clay also acknowledged the possibility that the helpers in the cabin might have obstructed his view of the passenger mirror while they were changing their clothes.

### 5. Driving a garbage truck is dangerous.

CEO Atkinson testified that trash collection is "the fifth most dangerous industry in the United States"; thus, he testified, the driver should always use his "resources to help guide the truck." Clay agreed that operating a garbage truck is very dangerous if the proper policies are not followed.

7

### 6. Clay's reversing speed.

The jury heard conflicting testimony about the speed at which Clay reversed. CEO Atkinson testified that the company completed an internal investigation after the incident and concluded that Clay was reversing at a speed of "[a]bout one and a half, 2 miles an hour."

Conversely, the State's expert, Investigator Bledsoe, opined that Clay was reversing at an average speed of "[a]bout 8 miles per hour" when he backed over Warren. The defense's expert calculated that Clay was reversing at an average speed of "5.8 miles an hour." That expert asserted that Clay's initial speed was faster, but that Clay slowed down to "considerably less than 5.8 miles an hour" when he hit Warren.

### 7. Warren.

The jury heard testimony that Warren had been drinking on the day of the incident. No evidence showed exactly how much Warren drank that day though. For instance, the medical examiner testified that she was unable to opine on Warren's level of intoxication due to the lack of blood and the type of test performed.

\*　　　　\*　　　　\*

At the close of the evidence, the trial court instructed the jury on murder and the lesser-included offenses of manslaughter and criminally negligent homicide.[3] The jury found Clay guilty of manslaughter. Clay appealed.

## DISCUSSION

Clay argues the evidence is insufficient to support his conviction for manslaughter because the evidence does not rationally support an inference that Clay acted recklessly. On this record, and under the applicable standard of review, we disagree and affirm.

### A. Standard of Review

The standard of review here is well settled. In a sufficiency of the evidence challenge like this one, "we consider all the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

Importantly here, we defer to the jury to resolve conflicts in testimony, weigh evidence, and draw reasonable inferences. *Id.* The jury, as the sole judge of the facts and the credibility of the witnesses, may choose to believe or disbelieve any witness

---

[3]    *See* TEX. CODE CRIM. PROC. art. 37.09; *Cavazos v. State*, 382 S.W.3d 377, 383–84 (Tex. Crim. App. 2012) (manslaughter is lesser-included offense of murder).

or any portion of their testimony—and we may not substitute in our views for theirs. *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986); *see* TEX. CODE CRIM. PROC. arts. 36.13, 38.04. "When the record supports conflicting inferences, we presume that the jury resolved the conflicts in favor of the verdict and defer to that determination." *Merritt v. State*, 368 S.W.3d 516, 525–26 (Tex. Crim. App. 2012).

Circumstantial evidence is as probative as direct evidence in establishing a defendant's guilt—and circumstantial evidence can be sufficient. *Carrizales v. State*, 414 S.W.3d 737, 742 (Tex. Crim. App. 2013). If the cumulative force of all the incriminating circumstances is sufficient to support the conviction, each fact need not point directly and independently to guilt. *Hooper*, 214 S.W.3d at 13.

"The key question is whether the evidence presented actually supports a conclusion that the defendant committed the crime that was charged." *Morgan v. State*, 501 S.W.3d 84, 89 (Tex. Crim. App. 2016) (internal quotation marks omitted).

**B.     Law Governing the Offense**

A person commits manslaughter "if he recklessly causes the death of an individual." TEX. PENAL CODE § 19.04(a). A person acts recklessly with respect to the result of his conduct "when he is aware of but consciously disregards a substantial and unjustifiable risk" that the result will occur. *Id.* § 6.03(c); *see Ramos v. State*, 407 S.W.3d 265, 270 (Tex. Crim. App. 2013). "The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard

10

of care that an ordinary person would exercise under all the circumstances," as viewed from the defendant's standpoint. TEX. PENAL CODE § 6.03(c).

"Recklessness requires the defendant to actually foresee the risk involved and consciously decide to ignore it." *Williams v. State*, 235 S.W.3d 742, 751 (Tex. Crim. App. 2007). In determining whether a person acted recklessly, "[t]he issue is not one of theoretical possibility, but one of whether, given all the circumstances, it is reasonable to infer that the particular individual on trial was in fact aware of the risk." *Dillon v. State*, 574 S.W.2d 92, 95 (Tex. Crim. App. [Panel Op.] 1978). Recklessness is generally inferred from the acts, words, and conduct of the accused. *Moore v. State*, 969 S.W.2d 4, 10 (Tex. Crim. App. 1998). The "defendant need not be aware of the specific risk of another's death to commit manslaughter," just the risk of death generally. *Lovelace v. State*, 654 S.W.3d 42, 51 (Tex. App.—Amarillo 2022, no pet.); *see Stepherson v. State*, 523 S.W.3d 759, 763 (Tex. App.—Houston [14th Dist.] 2017, no pet.).

## C. The evidence is legally sufficient to support Clay's manslaughter conviction.

It is undisputed that Clay caused Warren's death by reversing the garbage truck he was driving over Warren. *See* TEX. PENAL CODE § 19.04(a). The question is whether sufficient evidence supports a finding beyond a reasonable doubt that Clay *recklessly* caused Warren's death. *See id.* § 6.03(c); *Stadt v. State*, 182 S.W.3d 360, 363–65, 364 n.3 (Tex. Crim. App. 2005). It does.

11

Viewed in the light most favorable to the verdict, the evidence showed the following:

- Multiple home surveillance videos showed Clay reversing the garbage truck toward Warren, striking him and causing him to fall backwards.

- The surveillance videos show the garbage truck rolled over Warren, crushing him with the passenger side wheels and killing him.

- Clay had a commercial driver's license.

- Clay admitted that he was unfamiliar with the area.

- Clay admitted to seeing Warren initially when he drove by the area, and he said that he reversed "to see what [Warren] wanted."

- Clay's garbage truck was equipped with a functional rearview camera as well as side mirrors on the driver and passenger sides.

- Clay agreed that operating a garbage truck is very dangerous if proper policies are not followed.

- The company policy required the driver to use his helpers to guide the driver while reversing the truck.

- Clay admitted he was aware of the company's policies and procedures for reversing, that his helpers needed to be outside the truck when reversing, and that he was in charge of the helpers.

- Clay admitted that it is dangerous to back up the truck with his helpers inside the cabin.

- Clay had two helpers in the cabin with him at the time of the incident; Clay did not utilize his helpers to guide him and instead had them inside the truck.

- Clay stated "[i]t's a possibility" that the helpers in the cabin might have obstructed his view of the passenger mirror.

12

Based on this evidence—viewed in the light most favorable to the verdict, and deferring to the jury's credibility determinations—the jury could have reasonably inferred that Clay was aware of but consciously disregarded a substantial and unjustifiable risk of death created by reversing a garbage truck in an unfamiliar residential neighborhood, without assistance and without following proper procedures, knowing there was a pedestrian nearby. "[I]f the actor was aware of the risk he was creating, and consciously disregarded that risk, however much he may have hoped that no harm would result, he was acting recklessly." *Williams*, 235 S.W.3d at 751 (quoting ROLLIN M. PERKINS & RONALD N. BOYCE, CRIMINAL LAW 850 (3rd ed. 1982)); *see Lewis v. State*, 529 S.W.2d 550, 553 (Tex. Crim. App. 1975) (reckless conduct "involves conscious risk creation, that is, the actor is aware of the risk surrounding his conduct or the results thereof, but consciously disregards that risk").

Clay's arguments in response do not change this result. First, Clay points out that the jury heard evidence that he was an experienced driver with a commercial driver's license with "no history of unsafe driving" who had completed specialized driving training. But the jury could have determined that this supports a rational inference that Clay—as an experienced commercial driver—was aware of but consciously disregarded the substantial risk under the circumstances.

For example, in *Mitchell v. State*, we affirmed the conviction of a city dump truck driver who caused an accident that killed a pedestrian, when the evidence showed that the driver "with his specialized training, should have been aware of the increased risk of this conduct given the size of his vehicle and its decreased stopping abilities." 321 S.W.3d 30, 40 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd); *see also Pena v. State*, 522 S.W.3d 617, 623 (Tex. App.—Houston [14th Dist.] 2017, pet. ref'd) (conviction affirmed for truck driver who struck child; evidence showed driver, "as an experienced commercial truck driver making a familiar turn," should have been aware that his truck could hit the child while turning). So too here.

Clay's remaining arguments fare no better. Clay asserts that "rain, humidity, and dirt can obscure the view from the camera" and that "[i]t was rainy and misty on the day of the accident." To be sure, the jury could have chosen to believe Clay on this point. But the jury heard conflicting testimony as to whether Warren would have been visible on the camera and whether the rain would have affected the view from the camera. "[W]e presume that the jury resolved the conflicts in favor of the verdict and defer to that determination." *Merritt*, 368 S.W.3d at 525–26. And even if the jury believed that Clay was unable to see well, the jury could have still determined that it was reckless to then reverse, in bad weather, without using assistance or following company policy. *See Banister v. State*, 761 S.W.2d 849, 850

14

(Tex. App.—Beaumont 1988, no pet.) (dump truck driver recklessly reversed in heavy fog).

Clay also asserts that he was reversing "slowly" when the incident occurred. But the jury heard conflicting testimony regarding the speed at which Clay reversed the truck, too. And we again must defer to the jury's verdict. *See Merritt*, 368 S.W.3d at 525–26; *see also, e.g.*, *Griffith v. State*, 315 S.W.3d 648, 652 (Tex. App.— Eastland 2010, pet. ref'd) (manslaughter conviction affirmed; "[t]he fact that there is no evidence that [driver] was driving at a high rate of speed is of little consequence because he obviously drove the van at a speed capable of killing [victim] when he struck her").

Finally, Clay attempts to shift the blame for the incident onto Warren. For example, he argues that Warren was intoxicated and angry. Clay relatedly contends that it was unreasonable for the jury to conclude that Clay was aware of the risk of Warren walking into the path of the reversing garbage truck, which had its lights flashing and back-up alarm activated. But the jury—as the sole judge of the facts and credibility of the witnesses—weighed this evidence (and the rest of the evidence) before reaching their verdict. *See Sharp*, 707 S.W.2d at 614; *Hooper*, 214 S.W.3d at 13 (we defer to the factfinder to resolve conflicts in testimony, weigh evidence, and draw reasonable inferences). "[U]nder our standard of review, we must consider all of the evidence in the light most favorable to the jury's decision."

*Melgar v. State*, 593 S.W.3d 913, 922 (Tex. App.—Houston [14th Dist.] 2020), *pet. dism'd, improvidently granted*, No. PD-0243-20, 2022 WL 2240263 (Tex. Crim. App. June 22, 2022).

As explained, the "defendant need not be aware of the specific risk of another's death to commit manslaughter." *Lovelace*, 654 S.W.3d at 51. Rather, "[t]he major factor to be considered is the conscious disregard of the risk *created* by the actor's conduct." *Williams v. State*, 531 S.W.3d 902, 912 (Tex. App.—Houston [14th Dist.] 2017), *aff'd*, 585 S.W.3d 478 (Tex. Crim. App. 2019). Here, a rational trier of fact could have found Clay recklessly caused Warren's death by consciously disregarding the risk of death created by him reversing the garbage truck as he did. *See, e.g.*, *Trepanier v. State*, 940 S.W.2d 827, 829–30 (Tex. App.—Austin 1997, pet. ref'd) (affirming manslaughter conviction and rejecting driver's argument that he was not aware of the risk that a bicyclist (who he struck) would be traveling on the shoulder of the highway; driver created substantial risk when he drove on shoulder and consciously disregarded that risk); *see also Jones v. State*, 712 S.W.3d 151, 156–57, 161 (Tex. App.—Corpus Christi–Edinburg 2024, no pet.) (affirming manslaughter conviction despite driver seeking to blame victim "by presenting evidence that [victim] had a delayed reaction to the impending accident and implying that she may have been distracted or impaired").

When, as here, "the inferences made by the factfinder are reasonable in light of the cumulative force of all the evidence when considered in the light most favorable to the verdict, the conviction will be upheld." *Nowlin v. State*, 473 S.W.3d 312, 317 (Tex. Crim. App. 2015) (internal quotation marks omitted). Considering the evidence in the light most favorable to the verdict, a rational juror could have found the essential elements of manslaughter beyond a reasonable doubt. *See* TEX. PENAL CODE §§ 6.03(c), 19.04(a); *Hooper*, 214 S.W.3d at 13. Clay's sole issue is overruled.

## CONCLUSION

We affirm the trial court's judgment.

Jennifer Caughey
Justice

Panel consists of Justices Rivas-Molloy, Gunn, and Caughey.

Do not publish. TEX. R. APP. P. 47.2(b).