Darrell Glenn GRAHAM, Appellant,

v.

The STATE of Texas, Appellee.

Larry Glynn UTECHT, Appellant,

v.

The STATE of Texas, Appellee.

Nos. 66184, 66185.

Court of Criminal Appeals of Texas,
En Banc.

July 20, 1983.

Rehearing Denied Oct. 12, 1983.

J. Michael Coman, Pasadena, for appellant.

John B. Holmes, Jr., Dist. Atty., James C. Brough and Paul Coselli, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty. and Alfred Walker, Asst. State's Atty., Austin, for the State.

## OPINION

CLINTON, Judge.

These are appeals from convictions for criminally negligent homicide. The jury assessed punishment for appellant Graham is a $2,000.00 fine and 270 days in jail; the punishment for appellant Utecht is a $2,000.00 fine and 180 days in jail.

The evidence established that on December 16, 1977, in the early evening, two young couples left Liberty to drive to Pasadena to see an Elvis impersonator at the Cactus Club. Lloyd Gay drove Mary Lou Johnson's 1977 Pontiac Firebird, carrying her and her brother, Carl Johnson, and his date, Carrie Green. After the show, the couples left and headed home shortly before 11:00 p.m.

In the interim, appellant Graham and Janice Weeks were both at the home of appellant Utecht and his wife, Rebecca, in Pasadena. The group apparently decided to go to another friend's house to shoot pool. Weeks asked Graham if he would give her a ride because she had never ridden in his Corvette. Shortly before 11:00 p.m. the group left.

According to witnesses, Graham's Corvette and Utecht's Ford pickup were stopped side by side at a light, headed east on Red Bluff, right before the intersection of Red Bluff and the feeder roads of the Beltway 8 overpass in Pasadena. The women "looked like they were hollering back at each other—seemed like they were egging each other on." When the light changed to green, the truck and the Corvette took off "real fast" with "tires squealing," gaining speed steadily as they approached the Red Bluff-Beltway 8 intersection. At all times, the light at that intersection facing appellants was red.

Simultaneously, Lloyd Gay and his group in the Firebird turned on to the Beltway 8 feeder headed north. James Ross testified he was about four car lengths behind the Firebird which was moving very fast. As they approached the light at Beltway 8 feeder and Red Bluff, it was yellow. According to Ross, he could see the Firebird was going to run the yellow light and he decided to try it too. Ross realized the light would be red by the time he hit the intersection, and he began to "look for a way out," when he saw to his left Utecht's truck between the highway pilings supporting the Beltway 8 overpass. Ross testified he started braking and could see a collision between the Firebird in front of him and the truck approaching from his left was imminent.

In the intersection, Utecht's truck first hit the Firebird driven by Gay. The light changed. Then Graham's Corvette hit the Firebird and landed on top of it; a Plymouth Fury landed on top of the Corvette. Four other cars were also ultimately involved in the collision. James Goyer, Fire Chief for the City of Pasadena, testified that appellant Graham was walking around the Corvette in somewhat of a daze and said he was wondering if he was going to get a ticket for racing.

Appellant Utecht's wife, Rebecca, was dead at the scene; appellant Graham's passenger, Janice Weeks, was dead at the scene; Lloyd Gay, the driver of the Firebird and one of his backseat passengers, Carrie

Green, were dead at the scene; Carl Johnson died a few days later.

 Appellants contend the evidence is insufficient to support the jury's guilty verdicts.

Specifically, appellants argue the evidence fails to establish "*a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint,*" as required by § 6.03(d).[1]

In this case, appellants were charged under V.T.C.A. Penal Code, § 19.07(a), which provides:

"A person commits an offense if he causes the death of an individual by criminal negligence."

It was recently observed in *Lugo-Lugo v. State,* 650 S.W.2d 72 (Tex.Cr.App.1983) (Opinion Concurring) that all statutory proscriptions under the 1974 Penal Code may be divided into "elements of conduct" for purposes of analyzing and distributing the "required culpability" element of the given offense under Chapter 6. It was further noted that a person cannot be criminally negligent with respect to the "nature" of his conduct, but rather, criminal negligence goes to "circumstances surrounding conduct" or "result of conduct."

In reviewing the "elements of conduct" extant in the offense here charged, it is clear the "nature of conduct" is "cause;" the "result of conduct" is "death of an individual;" the statute, § 19.07, supra, however, does not include any "circumstances surrounding conduct." Therefore, the "required culpability" of the statute goes—consonant with all homicides—to the "required result:" "death of an individual." [2]

Conceptualized in this fashion, the burden of proof on the State was to show that appellants ought to have been aware of a substantial and unjustifiable risk that death of an individual would occur as a result of their conduct; that *the failure to perceive the risk* of a resulting death *was a gross deviation* from the standard of care that an ordinary person would exercise under all circumstances as viewed from appellants' standpoint.

In short, it is the "failure to perceive" the risk of a resulting death which must rise to the level of a "gross deviation" from an ordinary standard of care.

When coupled with the acts of speeding, racing and ignoring a steady red traffic control signal while approaching an intersection, the failure to perceive the risk of a death is clearly a gross deviation from the standard of care an ordinary person would exercise under all circumstances as viewed from the appellants' standpoint; moreover, all the ingredients of a criminally negligent homicide are present upon proof that a death did result. We hold the State did prove each of these ingredients and the evidence is therefore ample to support the jury's verdicts.

1. Section 6.03(d) provides:
 "A person acts with criminal negligence, or is criminally negligent, with respect to circumstances surrounding his conduct or the result of his conduct when he ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur. *The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.*"
 (All emphasis is supplied throughout by the writer of this opinion unless otherwise indicated.)

2. Two "acts" alleged in the informations against appellants were abandoned by the State. The jury was authorized to convict upon finding as to each appellant and as to each of four victims that the death was caused "by [appellant's] operating a motor vehicle on a public highway and causing his vehicle to collide with a motor vehicle ... said collision being caused by the defendant's engaging in a contest of speed, his failure to obey a traffic control signal which was exhibiting ... a steady red signal, or his failure to maintain his vehicle under proper control by operating it at a greater rate of speed than was reasonable and prudent under the conditions then existing...."

By their second through sixth grounds of error, appellants complain of the admission of certain "investigator's reports" which were appended to each of the five autopsy reports admitted into evidence.

The record reflects Dr. Joseph Jachimczyk, Chief Medical Examiner for Harris County, testified as to the cause of the deaths of the five victims. The State then asked Jachimczyk most of the questions which would establish the reliability of the written autopsy reports and thereby render them admissible into evidence as exceptions to the prohibition against hearsay under Article 3737e, V.A.C.S., the Business Records Act.[3]

The State failed, however, to ask Jachimczyk if the employee or representative who made the records or memoranda had "personal knowledge of [the] act, event or condition" reflected therein. See Article 3737e, supra, § 1(b).

When the autopsy reports were offered into evidence as State's Exhibits 29–33 and tendered to defense counsel for inspection, the first objection lodged was:

"We have no objections to the first page signed by Dr. Jachimczyk or any chemical test made by Dr. Morgan, however, I don't know who H.H. Hall is, and there seems to be a report attached by Hall."

The prosecutor then adduced an explanation by the witness that Harvey Hall is a medical investigator who "makes the scene in my behalf and that is the information he submitted to me." Jachimczyk testified that Hall's report was a part of his own autopsy report.

The State again tendered the entire report contained in each exhibit. Appellants objected again:

"Objection to the part by Hall as being hearsay and it seems to go to the ultimate issue in this case."

This objection was overruled and the exhibits were admitted in their entirety.

Appellants now complain there was no indicia of reliability of the facts asserted in the investigator's reports, citing legion cases. The State's primary retorts are that the investigator's report is a part of autopsy reports required by law,[4] and that *most* of the facts contained therein were recorded on the basis of investigator Hall's personal knowledge.

It is true that *most* of the facts in the reports were recorded with personal knowledge; however, the assertions made in each report that the drivers of the Corvette and Ford truck "were racing and ran a red light" clearly were not made on the basis of Hall's personal knowledge, and were inadmissible.

However, we believe appellants' delayed objection to the "reliability" of these specific fact assertions is behindhand. For, as we have repeatedly attempted to demonstrate to the bench and bar, the most basic indicia of reliability of such records is the establishment of the socalled "predicate for admission." *Clayton and Gallegos v. State,* 652 S.W.2d 950 (Tex.Cr.App., 1983); *Todd v. State,* 598 S.W.2d 286 (Tex.Cr.App.1980); *Porter v. State,* 578 S.W.2d 742 (Tex.Cr. App.1979).

Often inattentively treated as some rote exercise, the statutory requisites for admission *are* the "indicia of reliability;"[5] accordingly, counsel would do well to require the offering party to specify the statute under which such records are offered and request time to obtain that statute so its

---

3. The prosecutor referred to the questioned records as "Official records," but it is clear from the record that the criteria utilized for their admission was Article 3737e, supra.

4. See Articles 49.03 and 49.25, V.A.C.C.P.

5. Records that are compiled in an unreliable fashion will almost invariably fail to qualify under the records exceptions to the hearsay rule. E.g., *Porter,* supra. The record which does technically qualify, but is nevertheless unreliable is an aberration. See, e.g., *Coulter v. State,* 494 S.W.2d 876 (Tex.Cr.App.1973).

requisites can be carefully followed, then explored in detail on crossexamination.

In this case, the fact of the entrants' "personal knowledge" was not established by the State; but, neither was this failure objected to or highlighted by the defense on crossexamination. Appellants' failure to so object or illustrate the State's failure to establish this "indicia of reliability" constitutes a waiver of the evidentiary complaint made here. Compare *Porter, supra*.

Accordingly, grounds of error two through six are overruled.

In their first grounds of error, appellants contend the informations underlying their convictions are "null and void for failure to state a criminal wrong..."

The informations returned against both appellants alleged that each did:

"... cause the death of Carrie Green[6] ..., by criminal negligence, namely; by operating a motor vehicle on a public highway and causing his vehicle to collide with a motor vehicle occupied by the deceased, said collision being caused by the defendant's engaging in a contest of speed, his failure to obey a traffic control signal which was exhibiting to the defendant a steady red signal, his failure to keep a proper lookout for the vehicle he struck, his failure to maintain his vehicle under proper control by operating it at a greater rate of speed than was reasonable and prudent under conditions then existing, and his failure to guide his vehicle away from the vehicle he struck. * * * "

Appellants' contention, as we understand it, is that the "acts" constituting the conduct denounced by V.T.C.A. Penal Code, § 19.07,[7] and which must be alleged "with reasonable certainty"[8] for purposes of "notice," must within themselves demonstrate on the face of the charging instrument that they constituted "gross negligence"[9] as opposed to some other form of conduct. Appellants concede awareness of *Townsley v. State*, 538 S.W.2d 411 (Tex.Cr.App.1976), which held the relevant language of § 6.03 need not be alleged in a charging instrument for the lesser homicides, but urge that just such an allegation would be the most efficient method of demonstrating "gross negligence" on the face of an information. The evil appellants perceive in the failure to "plead acts in the terms of the statute defining criminal negligence or recklessness" is that it would be "permissible for the State to allege, for both the offense of involuntary manslaughter and criminally negligent homicide, *the identical acts or facts it seeks to prove* against the accused person;" appellants conclude that, "by allowing the State to plead as it did ... it is impossible to determine whether a person is charged with ... 'recklessly' causing the death ... or by 'criminal negligence' causing the death of another."

We first observe that this argument assumes a fusion of what are two distinct elements of the offense in question under the 1974 Penal Code: (1) the forbidden conduct; and, (2) the required culpability. See V.T.C.A. Penal Code, § 1.07(a)(13). While

---

**6.** Of course both informations contained four counts which were identical except for the names of the victims and their relative positions in the collision. The count quoted in the text is the first one of four in both charging instruments.

**7.** "A person commits an offense if he causes the death of an individual by criminal negligence."

**8.** Article 21.15, V.A.C.C.P. provides in relevant part:

"Whenever recklessness or criminal negligence ... is a[n] ... element of any offense, ... the complaint, information, or indictment in order to be sufficient in any such case must allege, with *reasonable certainty,* the act or acts relied upon to constitute recklessness or criminal negligence, and in no event shall it be sufficient to allege merely that the accused, in committing the offense, acted recklessly or with criminal negligence."

**9.** See n. 1, *ante*.

it is true that some opinions of the Court, and even Article 21.15, supra, seem not to differentiate "acts" from "criminal negligence," [10] the new penal code plainly requires the demarcation. Thus the failure to perceive the risk of death is not invariably exhibited or demonstrated by the actor's conduct; the law requires only that they generally coincide.

Accordingly, in order to give full effect to Article 21.15, supra, under the 1974 Penal Code's scheme of identifying "conduct" distinct from mental "culpability," that provision must be read to require that a sufficient charging instrument "must allege with reasonable certainty the act or acts relied upon to constitute [the forbidden conduct committed with] recklessness or criminal negligence ...," and we so hold. Accord *Thomas v. State*, 621 S.W.2d 158 (Tex.Cr.App.1981). The failure of a charging instrument to allege such acts gives the accused grounds to complain of adequate "notice" by pretrial exception. *Id.*

It follows then, that it is indeed permissible for the State to allege and prove the identical acts—"conduct"—for both involuntary manslaughter and criminally negligent homicide, for the *only* distinction between the two is the "required culpability" elements of each offense; by definition, this makes the latter a lesser offense included in the former. Article 37.09(3), V.A.C.C.P.[11]

Moreover, it is untenable to say that it is impossible to determine from these informations whether appellants were charged with involuntary manslaughter or criminally negligent homicide when the charging instruments patently allege that the forbidden conduct and the required result thereof was done "by criminal negligence." That allegation alone is sufficient to notify appellants that the culpable mental state to be proved is that set out in § 6.03(d), supra, and its terms are incorporated by reference. We agree with appellants that the State could have alleged the same conduct alleged here, but coupled it with "recklessness" and the informations would allege the offense of involuntary manslaughter instead of criminally negligent homicide. In view of the evidence adduced, it is curious appellants complain of their being charged with, and convicted for, the lesser offense.

We hold the informations in issue clearly allege an identifiable offense against the law. No fundamental error is shown.

This ground of error is overruled.

The judgments of conviction are affirmed.

TEAGUE, MILLER and CAMPBELL, JJ., not participating.

---

**10.** Article 21.15, supra, read alone seems to *equate* "acts" with "criminal negligence." See n. 8, *ante.*

**11.** For example, both the evidence adduced and the charging instruments would have supported a conviction for either offense in *Ormsby v. State*, 600 S.W.2d 782 (Tex.Cr.App.1979); *Branham v. State*, 583 S.W.2d 782 (Tex.Cr.App. 1979); *Del Moore v. State*, 574 S.W.2d 122 (Tex.Cr.App.1978); *Dillon v. State*, 574 S.W.2d 92 (Tex.Cr.App.1978); see also and compare *Schoelman v. State*, 644 S.W.2d 727 (Tex.Cr. App.1983); *Giles v. State*, 617 S.W.2d 690 (Tex. Cr.App.1981); and *Campbell v. State*, 614 S.W.2d 443 (Tex.Cr.App.1981).