Jeri Dawn MONTGOMERY, Appellant,

v.

The STATE of Texas, Appellee.

No. 14–09–00887–CR.

Court of Appeals of Texas, Houston (14th Dist.).

June 2, 2011.

Discretionary Review Granted Sept. 21, 2011.

Patricia Sedita, Houston, for appellant.

Eric Kugler, Houston, for Appellee.

Panel consists of Chief Justice HEDGES, Justice JAMISON, and Senior Justice HUDSON.

## OPINION

MARTHA HILL JAMISON, Justice.

A jury convicted appellant Jeri Dawn Montgomery of criminally negligent homicide and assessed her punishment at ten years' imprisonment, probated for ten years, and a $10,000 fine. In eight issues, appellant argues that the evidence against her is insufficient and the trial court erred by excluding some of her expert's testimony and limiting her cross-examination of one of the State's witnesses. Because the evidence is not sufficient to sustain the jury's finding that appellant acted with the requisite mental state for criminally negligent homicide, we reverse and render.

### BACKGROUND

At about 8:30 p.m. on March 24, 2008, appellant was driving her Hyundai Santa Fe in the center lane of the three-lane service road adjacent to Interstate 45. Cochise Willis had exited the freeway and was driving his Ford F–250 in the left lane of the service road. Terrell Housley, with Chance Wilcox in the passenger seat, was driving a Chevrolet Blazer on the entrance ramp to the freeway, which was to the left of the service road. The ramp and service road were separated by widening solid white lines, which formed a triangle often referred to as a "safety barrier." The roads were dry but dark.

Appellant was talking on her cell phone with a friend. When their call disconnected, Appellant realized she had missed the entrance to the freeway, and she attempted to move from the center lane of the service road to the entrance ramp. She began to pull into the left lane of the service road in front of Willis. Appellant was driving slower than Willis, who testified that he was driving at the speed limit of fifty miles per hour. When appellant "rather abruptly" pulled into the left lane, Willis attempted to slow his F–250 and

move into the center lane, but he was unable to avoid hitting the rear of appellant's Hyundai. The front left bumper of the F–250 struck the rear of the Hyundai slightly right of center. At the time of impact, appellant was almost completely in the left lane, and Willis was about halfway between the left lane and the center lane. Appellant had not entered the safety barrier before she was struck by Willis.

Appellant could not control her Hyundai after Willis struck her, and the Hyundai began to rotate in a counterclockwise direction. It crossed the safety barrier, and the front of the Hyundai struck the middle of the passenger side of Housley's Chevrolet on the entrance ramp. Appellant's Hyundai flipped onto its driver's side and continued to skid on the pavement until it came to a stop. Housley's Chevrolet began to rotate in a clockwise direction, and it jumped a curb separating the entrance ramp and the left lane of the service road. It flipped over and came to rest upside down. Wilcox was not wearing a seatbelt, and he was thrown out of the Chevrolet during the accident. He died at the scene. Willis maintained control of his vehicle and came to a stop in the emergency lane of the service road.

Ronald Soots, an accident investigator with the Harris County Sheriff's Office, was dispatched to the scene of the accident. He collected data at the scene, including measurements of tire marks on the road, and conducted follow-up interviews. Brian Wilbanks, another accident investigator and reconstructionist with the same office, was primarily responsible for reconstructing the accident. Both Soots and Wilbanks opined that appellant was responsible because she made an unsafe lane change. Wilbanks testified that Willis could not have avoided striking appellant's vehicle.

Appellant was indicted for the offense of criminally negligent homicide. *See* Tex.

Penal Code § 19.05. The indictment alleged that she made an unsafe lane change and failed to keep a proper lookout and that her motor vehicle was used as a deadly weapon. During trial, the State emphasized appellant's cell phone usage immediately prior to the accident, urging the jury to "set a precedent" regarding cell phone usage while driving. The jury found appellant guilty of criminally negligent homicide as alleged in the indictment and made an affirmative finding on the deadly weapon issue, which increased the punishment from a state jail felony to a third degree felony. *See id.* §§ 12.35(c)(1), 19.05(b).

### SUFFICIENCY OF THE EVIDENCE

■ In appellant's first six issues, she argues that the evidence is legally and factually insufficient to support her conviction for criminally negligent homicide. While this appeal was pending, a majority of the Court of Criminal Appeals agreed that only one standard should be used to evaluate the sufficiency of the evidence in a criminal case: legal sufficiency. *Brooks v. State,* 323 S.W.3d 893, 895 (Tex.Crim. App.2010) (plurality opinion); *id.* at 926 (Cochran, J., concurring). Accordingly, we review the sufficiency of the evidence in this case under a rigorous and proper application of the *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), legal sufficiency standard. *Brooks,* 323 S.W.3d at 906 (plurality opinion); *Pomier v. State,* 326 S.W.3d 373, 378 (Tex. App.-Houston [14th Dist.] 2010, no pet.).

### A. Standard of Review

When reviewing the sufficiency of the evidence, we view all of the evidence in the light most favorable to the verdict to determine whether a rational jury could find the essential elements of the crime beyond a reasonable doubt. *Isassi v. State,* 330

S.W.3d 633, 638 (Tex.Crim.App.2010); *Williams v. State,* 235 S.W.3d 742, 750 (Tex.Crim.App.2007). This court does not sit as a thirteenth juror and may not substitute its judgment for that of the fact finder by re-evaluating the weight and credibility of the evidence. *Isassi,* 330 S.W.3d at 638; *Williams,* 235 S.W.3d at 750. Instead, we defer to the fact finder's responsibility to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from the facts. *Williams,* 235 S.W.3d at 750. These principles apply equally to circumstantial and direct evidence. *Isassi,* 330 S.W.3d at 638. Our duty as a reviewing court is to ensure that the evidence presented actually supports a conclusion that the defendant committed the crime. *Williams,* 235 S.W.3d at 750.

We may also be required to determine as a matter of law whether the State has alleged conduct that constitutes a criminal offense. *Id.* To determine whether there is sufficient evidence of criminal negligence, "it is not enough to provide the jury with a set of legally correct definitions and then simply turn them loose and accept whatever they decide." *See id.* at 753 (criminal recklessness). We must be certain that the State has proven a prima facie case of criminal negligence as a matter of law. *Id.*

### B. Mental State for Criminal Negligence

■ In appellant's first and fourth points of error, she challenges the sufficiency of the evidence to establish the culpable mental state of criminal negligence.[1] In Texas, a person commits the offense of criminally negligent homicide if he or she (1) causes the death of an individual, (2) ought to have been aware that

---

1. Appellant also argues that we should not consider any evidence of her cell phone usage in determining the sufficiency of the evidence

because the use of a cell phone was not alleged in the indictment. *See* Tex.Code Crim. Proc. art 21.15 (requiring specific acts of

his or her conduct created a substantial and unjustifiable risk of death, and (3) failed to perceive the risk, which is of such a nature and degree that the failure constituted a gross deviation from the standard of care an ordinary person would have exercised under the circumstances. *Stadt v. State*, 120 S.W.3d 428, 433 (Tex.App.-Houston [14th Dist.] 2003), *aff'd*, 182 S.W.3d 360 (Tex.Crim.App.2005); *see also* Tex. Penal Code § 6.03(d); *Tello v. State*, 180 S.W.3d 150, 156 (Tex.Crim.App.2005); *Graham v. State*, 657 S.W.2d 99, 101 (Tex.Crim.App.1983). Accordingly, in order to convict appellant of criminal negligence, the State was required to prove not merely that she did something a person of ordinary prudence would not have done, but that her failure to perceive that a substantial risk of death would result from her conduct *grossly* deviated from an ordinary standard of care. *See Tello*, 180 S.W.3d at 156.

■ Criminal negligence entails a more culpable mental state than mere civil negligence. *See Williams*, 235 S.W.3d at 753. The distinction lies in the degree of deviation from an ordinary standard of care: "[c]onduct that constitutes criminal negligence involves a greater risk of harm to others ... than does simple negligence." *Tello*, 180 S.W.3d at 158–59 (Cochran, J., concurring). The level of " 'carelessness required for criminal negligence is appreciably more serious than that for ordinary civil negligence, and ...

the carelessness must be such that its seriousness would be apparent to anyone who shares the community's general sense of right and wrong.' " *Tello*, 180 S.W.3d at 158 (majority opinion) (quoting *People v. Boutin*, 75 N.Y.2d 692, 556 N.Y.S.2d 1, 555 N.E.2d 253, 254 (1990)).[2] To rise to the level of criminal negligence, the defendant's conduct must constitute more than a " '[m]ere lack of foresight, stupidity, irresponsibility, thoughtlessness, [or] ordinary carelessness, however serious the consequences may happen to be.' " *Williams*, 235 S.W.3d at 751 (first alteration in original) (quoting *People v. Carlson*, 176 Misc. 230, 26 N.Y.S.2d 1003, 1005 (N.Y.Cnty.Ct.1941)). It must be of such a nature that a level of moral blameworthiness attaches. *See Williams v. State*, 235 S.W.3d 742, 750–51 (Tex.Crim.App.2007); *see also Tello*, 180 S.W.3d at 158 (majority opinion) ("This case ... involves 'some serious blameworthiness in the conduct that caused it.' ") (quoting *Boutin*, 556 N.Y.S.2d 1, 555 N.E.2d at 256).

As this court observed in *Tello v. State*, when courts in Texas have addressed the level of evidence necessary to convict a defendant of criminally negligent homicide resulting from vehicle-related accidents, "speeding, racing, and intoxication often are contributing factors." 138 S.W.3d 487, 493 (Tex.App.-Houston [14th Dist.] 2004), *aff'd*, 180 S.W.3d 150.[3] None of these factors is present in the present case. In *Todd v. State*, there was evidence that the

---

criminal negligence to be alleged in the indictment). However, we decline to entertain such an argument made for the first time on appeal. *See* Tex.R.App. P. 38.1(i); *see also Studer v. State*, 799 S.W.2d 263, 272–73 (Tex.Crim.App.1990) (holding that an objection in the trial court is required to preserve error as to the sufficiency of a charging instrument alleging acts required by article 21.15).

**2.** The court in *Boutin* reversed a conviction where the defendant struck a police cruiser that was parked in the right lane of a highway

with flashing lights, killing an officer and a citizen, but the defendant was not speeding or racing and did not disobey a traffic signal. 555 N.E.2d at 253–56.

**3.** *Cf. Stadt*, 182 S.W.3d at 364 (holding that a rational jury could conclude that the defendant was criminally negligent when he, among other things, was speeding and had taken a prescription medication that made him drowsy); *Graham v. State*, 657 S.W.2d 99, 101 (Tex.Crim.App.1983) (affirming conviction when the defendant was speeding, rac-

defendant was driving while distracted, as appellant admittedly was in the present case; however, there was also evidence in *Todd* of speeding and other egregious conduct supporting the conviction. 911 S.W.2d 807, 815 (Tex.App.-El Paso 1995, no pet.). Specifically, the defendant in *Todd* was tailgating another vehicle in rush hour traffic for about one and a half miles, traveling at a high rate of speed, and not watching the road. *Id.* Five seconds after another vehicle changed lanes to avoid a stalled vehicle in their lane, defendant struck the stalled vehicle. *Id.*

In vehicle cases where courts have upheld findings of criminally negligent homicide without evidence of speeding, racing, or intoxication, the evidence has clearly established a gross deviation from the standard of care. For example, two recent cases involved egregious misuse of a heavy commercial vehicle or trailer. *See Tello*, 180 S.W.3d at 156 (holding evidence was sufficient to sustain conviction for criminally negligent homicide where evidence demonstrated defendant's loaded trailer became detached, killing pedestrian, after defendant used a faulty hitch with obvious defects and that had been

hammered a number of times in an attempt to get it to latch properly and failed to utilize a safety chain); *Mitchell v. State*, 321 S.W.3d 30, 39–40 (Tex.App.-Houston [1st Dist.] 2010, pet. ref'd) (holding evidence was sufficient where it demonstrated that defendant, holder of a commercial driver's license, was driving a 31,000 pound dump truck at 37 miles per hour in a right-turn-only lane against a red light and failed to take evasive action or apply his brakes despite being warned three times by a passenger that a collision was imminent).[4]

At trial in the present case, the State presented evidence of appellant's use of a cell phone while driving, her unsafe lane change, and her failure to maintain a proper lookout. Only one of the three factors was a moving violation under Texas law: making an unsafe lane change.[5] However, the State placed primary emphasis on a factor that was not even listed in the indictment as proof of appellant's negligence: cell phone usage.[6] The State analogized using a cell phone while driving to driving while intoxicated, a moving violation subject to substantial criminal penalties. *See* Tex. Penal Code §§ 49.04, 49.09.

---

ing, and ignoring a steady red traffic control signal); *Lopez v. State*, 630 S.W.2d 936, 941 (Tex.Crim.App.1982) (affirming conviction when the defendant was speeding and ran a red light on a city thoroughfare); *Brown v. State*, 773 S.W.2d 65, 66–67 (Tex.App.-Fort Worth 1989, pet. ref'd) (affirming conviction when the defendant was speeding, entered an intersection against a red light, did not slow down as he approached or entered the intersection, and knew, from traveling the road regularly, that the intersection required caution due to a blind spot created by a curve in the road).

4. The Court of Criminal Appeals cases of *Williams* and *Stadt*, wherein the court discussed many of the principles governing criminally negligent homicide prosecution, did not involve challenges to the sufficiency of the evidence on that offense. *Williams*, 235

S.W.3d at 750–53, 769 (distinguishing criminal negligence from recklessness and reversing conviction which was based on recklessness); *Stadt*, 182 S.W.3d 360, 365 (Tex.Crim. App.2005) (holding trial court properly charged jury on criminally negligent homicide as a lesser included offense).

5. Under section 545.060(a) of the Texas Transportation Code, "[a]n operator on a roadway divided into two or more clearly marked lanes for traffic: (1) shall drive as nearly as practical entirely within a single lane; and (2) may not move from the lane unless that movement can be made safely." Tex. Transp. Code § 545.060(a).

6. During closing argument, the State referenced appellant's use of a cell phone at least seven times.

However, in doing so, the State could be seen as "legislating through prosecution," and, by continuing that emphasis in this appeal, the State encourages this court to legislate through judicial fiat.[7] Except under very limited circumstances not at issue in this case, using a cell phone while driving is not an illegal activity in Texas.[8]

Neither the State nor appellant has cited a case in which a defendant was convicted of criminally negligent homicide because of the defendant's use of a cell phone while driving. Neither has this court discovered any criminally negligent homicide cases addressing the sufficiency of the evidence when the defendant was driving and talking on a cell phone.[9]

Despite focusing on cell phone usage as the key factor establishing that (1) appellant ought to have been aware of a substantial and unjustifiable risk that a death would result from her actions, and (2) her failure to perceive this risk was a gross deviation from the standard of ordinary care, the State introduced no competent evidence establishing that cell phone usage while driving increases the risk of fatal accidents. There were no human factors

witnesses or scientific studies introduced at trial. One of the State's witnesses, Ronald Soots, testified that he believed cell phone usage was a factor in a growing number of accidents and could have been a factor here, but he cited no data or studies in support of these bare conclusions.

■ Further, on cross-examination, appellant's accident reconstructionist, April Yergin, testified that recent studies have shown that cell phone usage can be a distraction while driving and that there is a growing public awareness of the issue; however, as mentioned, no such studies were introduced or discussed in detail. Yergin also acknowledged that (1) as an accident specialist, her knowledge was well ahead of that of the general public, and (2) she sometimes uses a cell phone while driving. Appellant also testified that she was distracted by her cell phone prior to the collision; however, none of this evidence is sufficient to demonstrate that she ought to have been aware of a substantial and unjustifiable risk that a death would result from her actions or that her failure to perceive this risk was a gross deviation from the standard of ordinary care.[10]

7. In his closing, the prosecutor encouraged the jury to "set a precedent" regarding cell phone usage while driving. Arguments that cell phone usage while driving should be made illegal in Texas are properly directed to the legislature and not this court or the jury below.

8. Amendments to sections 545.424 and 545.425 of the Texas Transportation Code, prohibiting young drivers from using cell phones and prohibiting all drivers from using cell phones in school crossing zones, with certain exceptions, became effective September 1, 2009, eighteen months after this accident. Tex. Transp. Code §§ 545.424–.425.

9. We note, however, that some courts in jurisdictions requiring only simple civil negligence to convict a defendant for negligent homicide have considered evidence the defendant used a cell phone while driving. *See Butts v. Unit-*

*ed States*, 822 A.2d 407, 416, 419 (D.C.2003) (holding evidence sufficient when the defendant was not speeding or driving recklessly, but he was talking on cell phone and had a blood alcohol level of more than twice the legal limit at the time of the accident; noting that talking on a phone while driving does not establish negligence as a matter of law, but it is evidence of negligence); *Commonwealth v. McGrath*, 60 Mass.App.Ct. 685, 805 N.E.2d 508, 513–14 (2004) (holding evidence sufficient when the defendant inexplicably struck a pedestrian on the side of the road, and it was not improper for prosecutor to argue in closing that the jury could infer that the defendant was using his cell phone at the time of the accident).

10. In addition to cell phone usage, many other activities commonly engaged in by drivers can also be distracting: changing radio stations, loading a CD into a CD player, talking

■ In addition to failing to present any evidence of an increased risk of death, the State also failed to present any evidence that such greater risk was generally known and disapproved of in the community. As the Court of Criminal Appeals has indicated, the level of " 'carelessness required for criminal negligence . . . must be such that its seriousness would be apparent to anyone who shares the community's general sense of right and wrong.' " *Tello,* 180 S.W.3d at 158 (quoting *Boutin,* 556 N.Y.S.2d 1, 555 N.E.2d at 254).

The Tennessee Supreme Court addressed analogous circumstances concerning evolving community awareness and standards in *State v. Jones,* 151 S.W.3d 494 (Tenn.2004), a case cited by the Texas Court of Criminal Appeals in *Williams.* The defendant in that case, Jones, was found guilty by a jury of criminally negligent homicide under definitions very similar to those in use in Texas. *Id.* at 499–500. In November 1998, Jones was holding her two-year old son in her lap in the front passenger seat of a vehicle that became involved in a minor traffic accident; the child was killed when the airbag inflated. *Id.* at 495–96.

In overturning Jones's conviction and reversing a lower appellate court's decision, the Tennessee Supreme Court held that the evidence was insufficient to demonstrate that Jones grossly deviated from the standard of care. *Id.* at 501, 503. The court reached this determination despite the fact that Tennessee had seat belt and child restraint laws in force at the time of the accident and the State introduced into evidence newspaper articles and television public service announcements to establish that information about the safe transportation of children was available to the community. *Id.* at 500–501. The Court first noted how new the risk of air bags was in 1998. Then, emphasizing statistics from one of the articles, showing that only about 60% of area children were being properly restrained, the court reasoned that:

> If 40% of the children being transported in Ms. Jones' community were being transported without being properly restrained at the time of the accident, it would be difficult for a rational trier of fact to conclude that it was a gross deviation from the standard of care at the time of the accident for Ms. Jones to transport her child improperly.

*Id.* at 501. Applying the reasoning in *Jones* to the present case, it would be difficult for a rational fact finder to conclude that because accident investigators, such as Soots and Yergin, might have been aware of increased risks from cell phone usage, it was a gross deviation from the standard of care for a member of the general public to use a cell phone while driving.

A distinction between *Jones* and the present case is that in *Jones,* the conduct in question (holding a child in the front seat of a car) was isolated from other factors; whereas, here, the evidence supports the conclusion that appellant's cell phone usage may have contributed to her failing to keep a proper lookout and making an unsafe lane change. Nevertheless, the State has maintained, both in the trial court and in the appeal, that it is the additional factor of cell phone usage, *i.e.,* distracted driving, which converted a simple moving violation into criminally negli-

---

to someone in the passenger's seat, searching for something in the glove box, handing something to a child in the back seat, reading billboard signs. Under proper circumstances, these activities could cause negligent driving. However, in the absence of evidence establishing a substantial and unjustifiable risk and a gross deviation from the standard of ordinary care, mere distracted driving does not rise to a level of moral blameworthiness necessitating the imposition of criminal sanctions.

gent homicide. The State failed to present evidence, however, that appellant's conduct and failure to perceive the risk attached thereto—while likely demonstrating "lack of foresight, stupidity, irresponsibility, thoughtlessness, [and] ordinary carelessness"—was a gross deviation from the ordinary standard of care justifying criminal sanctions. *Williams,* 235 S.W.3d at 751. This case is not like those discussed above involving high rates of speed, racing, intoxication or other clearly egregious conduct; here, the State has shown no more than distracted driving and a bad lane change. Without evidence establishing an increased risk of fatal crashes from cell phone usage and that such risk was generally known and disapproved of in the community, the additional factor of cell phone usage did not elevate appellant's conduct to criminally negligent homicide. In short, the evidence was legally insufficient to sustain the verdict.

██ We do not minimize the fact that Chance Wilcox tragically died in this accident. But Texas law makes clear that the circumstances for assessing criminally negligent homicide are judged from the defendant's perspective at the time of his or her actions, not from hindsight. *See* Tex. Penal Code § 6.03(d); *Williams,* 235 S.W.3d at 751–53. Supported by additional scientific research and increased public awareness, Texans may one day determine that cell phone usage while operating a vehicle is morally blameworthy conduct that justifies criminal sanctions; however, the State failed to establish that such was the case in March 2008, at the time of this accident.

We sustain appellant's first and fourth points of error. Because we sustain these points of error, we need not consider appellant's remaining points of error.

We reverse appellant's conviction and render a judgment of acquittal.

HUDSON, J., dissenting.[11]

J. HARVEY HUDSON, Senior Justice, dissenting.

The majority contends the evidence presented at trial is insufficient to sustain appellant's conviction for criminally negligent homicide because the State offered no evidence to show: (1) an increased risk of traffic deaths due to cell phone usage; and (2) that such risk, if any, is generally known and disapproved of in the community. While the majority may well wish for such evidence, neither of the above factors is an element of the offense. Thus, the State had no obligation to offer such proof. Accordingly, I dissent.

The elements of criminally negligent homicide are simply: (1) a person; (2) causes the death; (3) of an individual; (4) by criminal negligence. *Juneau v. State,* 49 S.W.3d 387, 391 (Tex.App.-Fort Worth 2000, pet. ref'd); *see also* TEX. PENAL CODE ANN. § 19.05 (West 2003); *Tello v. State,* 138 S.W.3d 487, 492 (Tex.App.-Houston [14th Dist.] 2004), *aff'd,* 180 S.W.3d 150 (Tex.Crim.App.2005). Here, the first three elements are not in dispute. Appellant contends only that when she caused the death of the victim, she did so without the requisite culpable mental state of "criminal negligence."

Criminal negligence has two components: (1) engaging in conduct that creates a substantial and unjustifiable risk to another; and (2) the actor's failure to perceive the risk is a gross deviation from the ordinary standard of care. *See* TEX. PENAL CODE ANN. § 6.03(d) (West 2003); *Tello,* 180 S.W.3d at 156.

**A. Increased risk of traffic deaths due to cell phone usage**

11. Senior Justice J. Harvey Hudson sitting by assignment.

"A person acts with criminal negligence ... with respect to circumstances surrounding his conduct ... when he ought to be aware of a substantial and unjustifiable risk." TEX. PENAL CODE ANN. § 6.03(d). Thus, the majority contends the State was obliged to show that cell phone use while driving poses a risk to others. However, the State never alleged that cell phone use constitutes a risk to others; rather, the State alleged in its indictment that appellant's risky conduct was: (1) failing to maintain a proper lookout; and (2) making an unsafe lane change. It would seem to be common knowledge that driving while failing to keep a proper lookout constitutes an extreme risk to others. Hypothetically, circumstances showing a driver failed to maintain a proper lookout might include evidence that he or she was: (1) legally blind; (2) driving without corrective lenses; (3) reading a book, map, or directions; (4) asleep or fatigued; (5) browsing the Internet; (6) applying cosmetic makeup; (7) day-dreaming; (8) rubbernecking; (9) looking at scenery or landmarks; or (10) eating, drinking, or searching the vehicle for a snack. Here, the State attempted to show appellant failed to maintain a proper lookout because she was distracted by her use of a cell phone.

Thus, contrary to the majority's assertion, the State had no burden to show that driving while using a cell phone is always distracting, commonly dangerous, generally risky, or causes increased traffic deaths. The State had only to show that in *this* case, under these circumstances, appellant's use of a cell phone was distracting, dangerous, and risky because it prevented her from maintaining a proper lookout.

Here, the record shows appellant was talking on her cell phone at the time of the accident.[1] Further, she *admitted* she was distracted by her use of the cell phone. Due to this distraction, appellant moved suddenly out of the center lane of the access road, at night, in poor visibility, without signaling, without looking for other vehicles traveling in the inside lane, and attempted to turn onto a freeway ramp contrary to traffic control stripes on the pavement.

Accordingly, I would find the State offered significant evidence that appellant was distracted by her use of a cell phone, that the distraction interfered with her ability to maintain a proper lookout and make a safe lane change, and that she ought to have been aware that her unsafe lane change and failure to keep a proper lookout created a substantial and unjustifiable risk.

**B. The risk of talking on a cell phone while driving is generally known and disapproved of in the community**

For conduct to rise to the level of criminal negligence, "[t]he risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint." TEX. PENAL CODE ANN. § 6.03(d). Thus, the essence of criminal negligence is the failure of the actor to perceive the risk created by his or her conduct. *Mendieta v. State*, 706 S.W.2d 651, 652 (Tex.Crim.App.1986).

The use of cell phones by drivers is pervasive. According to the National

---

1. The majority asserts appellant ended her cell phone conversation before the accident occurred. However, Ronald Soots, an accident investigator with the Harris County Sheriff's Office, testified, "The cell phone showed—the records show that she was on the phone at or around the time of the crash." Reviewing the evidence in the light most favorable to the verdict, as we must, the jury was entitled to conclude that appellant was on the phone at the time of the accident. *See Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim.App.2010); *Williams v. State*, 235 S.W.3d 742, 750 (Tex.Crim.App.2007).

Highway Traffic Safety Administration, "At any given moment during the daylight hours, over 800,000 vehicles are being driven by someone using a hand-held cell phone."[2] The majority considers the interesting issue of whether any conduct can be a "gross deviation" from the ordinary standard of care when it is engaged in by such a significant segment of the population. In their analysis, the majority relies on the rationale of the Tennessee Supreme Court in *State v. Jones*, 151 S.W.3d 494 (Tenn.2004).

Because 40% of children transported in vehicles in Tennessee are not placed in proper child restraints, the Tennessee court concluded that a person's failure to properly restrain a child in a motor vehicle simply cannot constitute a "gross deviation from the standard of care." *Id.* at 501. Thus, if enough people are grossly negligent on a routine basis, their conduct, by definition, cannot be grossly negligent. I disagree.

First, the negligent conduct in this case constituting a "gross deviation" from the ordinary standard of care was *not* talking on a cell phone—it was failing to maintain a proper lookout and making an unsafe lane change. Thus, while appellant's use of a cell phone, under the circumstances presented here, may have led to her failure to maintain a proper lookout and making an unsafe lane change, the State was under no obligation to prove that talking on a cell phone generally constitutes a "gross deviation" from the ordinary standard of care or is generally disapproved of in the community.

Second, whether an actor's conduct constitutes a gross deviation from the standard of care that would be exercised by an ordinary person in the same circumstances constitutes a question of fact to be resolved by the fact finder. *Phillips v. State*, 588 S.W.2d 378, 381 (Tex.Crim.App. 1979). Here, the jury was never asked to conclude whether the use of a cell phone while driving is unsafe under all circumstances and conditions. An alert driver, traveling in light traffic, on a rural road, in good weather, and in daylight conditions, may well be able to conduct a conversation without distraction and maintain a proper lookout while observing all traffic signs and statutes. Here, however, the jury concluded that appellant's failure to perceive the risk created by not maintaining a proper lookout and making of an unsafe lane change constituted a gross deviation from the ordinary standard of care. Appellant's use of a cell phone, under the facts and circumstances presented in this case, undoubtedly contributed to her failure to keep a lookout and unsafe lane change.

Finally, "the actor's conduct is weighed against an objective standard, that of the ordinary prudent man." *Tompkins v. State*, 774 S.W.2d 195, 225 (Tex.Crim.App. 1987). What an ordinary prudent person would do is not the same standard as what people do generally. For example, when asked, most cigarette smokers will readily concede that smoking is dangerous and imprudent. However, by definition, 100% of all cigarette smokers smoke. Likewise, although a significant number of drivers use cell phones while driving,[3] one recent

---

**2.** *Policy Statement and Compiled FAQs on Distracted Driving*, U.S. DEP'T OF TRANSP., NAT'L HIGHWAY TRAFFIC SAFETY ADMIN., http://www.nhtsa.gov/Driving + Safety/Distracted + Driving/Policy + Statement + and + Compiled + FAQs + on + Distracted + Driving (last visited May 4, 2011); *see also* U.S. DEP'T OF TRANSP., NAT'L HIGHWAY TRAFFIC SAFETY ADMIN., DOT HS

811 184, *Driver Electronic Device Use in 2008*, at 1 (Sept. 2009), *available at* http://www-nrd.nhtsa.dot.gov/pubs/811184.pdf (estimating that drivers in 11% of all vehicles use some type of cell phone at any given time during daylight hours).

**3.** *See* AAA FOUND. FOR TRAFFIC SAFETY, CELL PHONES AND DRIVING: RESEARCH UPDATE 8 (Dec.

study revealed that more than 80% of drivers believed using a cell phone while driving was dangerous,[4] and another study revealed that more than 80% of drivers believed it was a serious problem.[5] Even in 2003, the National Highway Traffic Safety Administration reported that seven in ten drivers believed making a phone call made driving more dangerous.[6] It is simply a sad fact of the human condition that each of us seems to believe "I can beat the odds." Thus, what is a gross deviation of care for you is not a gross deviation of care for me.

Accordingly, even if it could be shown that 100% of Texas drivers routinely drive while distracted due to cell phone use, such fact would not prevent twelve jurors from reasonably and rationally concluding that no ordinary *prudent* person would drive while distracted due to cell phone use.

## C. Conclusion

The majority imposes burdens upon the State not supported by law. Because the State presented abundant evidence that appellant's failure to perceive the substantial and unjustifiable risk created by her distracted driving—which led to her failure to maintain a proper lookout and making an unsafe lane change—constituted a gross

deviation from the ordinary standard of care, I would affirm the conviction.

---

2008), *available at* http://www.aaafoundation.org/pdf/CellPhonesandDrivingReport.pdf (reporting the results of two surveys in which 53% and 61% of respondents admitted to talking on a cell phone while driving in the preceding thirty days); Dawn Royal, The Gallup Org., National Survey of Distracted and Drowsy Driving Attitudes And Behaviors: 2002, at 20, 32 (Mar. 2003), *available at* http://www.nhtsa.gov/people/injury/drowsy_driving1/distracted03/DISTRACTEDFINALFINDINGS% 20REPORT.pdf (reporting that "about one in three of all drivers [use] a cell phone for outgoing or incoming calls while driving," and "about one in four drivers drive while talking on a wireless phone"); *see also* Humphrey Taylor, Harris Interactive, Large Majority of Drivers Who Own Cell Phones Use Them While Driving Even Though They Know This Is Dangerous 2 (The Harris Poll No. 58, June 8, 2009), *available at* http://www.harrisinteractive.com/vault/Harris–Interactive–Poll–Research–Safe–Driving–2009–06.pdf (noting that 73% of drivers who owned a cell phone admitted in 2006 to talking on a cell phone while driving).

4. Taylor, *supra*, at 4.

5. AAA Found. for Traffic Safety, *supra*, at 11. This study also noted that driving while talking on a cell phone "rated above aggressive drivers, excessive speeding, and drivers running red lights in terms of public perceptions of their seriousness." *Id.*

